[No. 44592. En Banc. September 22, 1977.]

JAMES R. SISLEY, ET AL, *Appellants,* v. SAN JUAN COUNTY, ET AL, *Respondents.*

*Roger M. Leed* (of *Shroeter, Goldmark & Bender*), for appellants.

*John B. Nason,* for respondent San Juan County.

*Bonjorni, Harpold & Fiori,* by *Duncan A. Bonjorni,* for respondent Carpenter.

STAFFORD, J.—This is an appeal from a judgment of the Superior Court denying relief requested in plaintiffs/appellants' (appellants) proposed order to show cause and denying with prejudice appellants' alternative writ of mandamus.

The basic issue is whether an Environmental Impact Statement (EIS) is required under the State Environmental Policy Act of 1971 (SEPA) for construction of a proposed commercial marina in San Juan County.

Deer Harbor is a small, southerly–facing sheltered bay near the west tip of Orcas Island. It is approximately 4,000 feet in length and 2,000 at its widest point. A tidal lagoon is located at the northerly end of the harbor.

In October of 1972, defendant/respondent (respondent) Norman Carpenter applied for a substantial development permit under the Shoreline Management Act of 1971 (SMA), RCW 90.58, to build a 94–slip marina at the head of Deer Harbor. The proposed project embraces 6 1/2 acres, 3 1/2 acres of state–owned aquatic land, managed by the State Department of Natural Resources, and 3 acres of tidelands and uplands. The planned structure would involve approximately 17,000 square feet of piling, finger piers, and docks and would extend 600 feet into the harbor. The channel entrance to the northerly lagoon area would be decreased to approximately 290 feet clearance between the proposed structure and the existing private moorage facility on the opposite shore. The contemplated upland support facilities include 27 parking spaces, a bathhouse–laundry, and a sewage dumping station with a 1500–foot sewer line and 1–acre drain field.

By May 1974, Mr. Carpenter had obtained the substantial development permit from defendant–respondent Board of County Commissioners of San Juan County (Board). In the next year he obtained a navigable water lease from the Department of Natural Resources, approval from the United States Army Corps of Engineers, and a building permit from respondent County with approval of the Department of Ecology to construct the upland support

facilities. Although an EIS had not been prepared, respondent Carpenter began driving piling at the site of the proposed marina.

In May 1974, appellants, who are residents of the Deer Harbor area, filed a class action against respondents San Juan County and the Board of County Commissioners in the form of an "application for a writ of mandamus and complaint for declaratory and injunctive relief for violation of citizens' environmental rights by government agencies and officials." They asked the Superior Court to declare respondent Carpenter's substantial development permit and building permit illegal and void until an EIS on the proposed marina was prepared. Respondent Carpenter was permitted to intervene as an additional defendant. The trial judge issued an alternative writ of mandamus which ordered San Juan County to cancel the permits or show cause why they were lawful. However, the show cause hearing was never held because all parties stipulated, and the trial court ordered, that all further proceedings would be stayed and the permits suspended until the Board had reviewed the environmental factors involved in the issuance of the shorelines permit and building permit for construction of the marina. The Board was ordered to determine whether, under SEPA, an EIS was required for the project. In effect the trial court, acting pursuant to the stipulation, remanded the matter for the Board to receive evidence and advice from the county and other governmental units as might be necessary for a complete assessment of the proposed project's environmental impact under SEPA.

The Board's actual consideration of the question, in response to this order, was twofold: the Commissioners solicited environmental information from the County Planning Department and they held a public hearing at which appellants and others were permitted to comment on the Planning Department's report and to speak on the proposed development. On March 3, 1975, at the close of the public hearing, the Board voted 2–to–1 that an EIS need not be prepared before the marina was built. The Board

furnished the court with no findings of fact or reasons to support its conclusion that an EIS was unnecessary.

Thereafter, appellants moved the trial court for an order requiring respondents to show cause why they should not (1) prepare an EIS and (2) conduct a proper hearing. The order was granted and on July 14 and September 9, 1975, the Superior Court reviewed the Board's decision. While limited testimony was received, the review was not a trial on the merits. Rather, it was a review of the Board's decision to determine whether it had followed the requirements of SEPA as originally contemplated in the court's September 16, 1974, order of remand. In essence, the trial court was supervising its own order of remand.

After the above–mentioned review, the trial court entered findings of fact and conclusions of law that the Board had "substantially complied" with the provisions of SEPA and that the Board's determination that an EIS was not necessary was "supported by substantial evidence." The order to show cause and the alternative writ of mandamus were dismissed on the same date. Appellants appealed, and the Court of Appeals certified the case to this court.

Appellants assign error to the trial court's affirmance of the Board's decision that an EIS was not required, under SEPA, for the proposed marina.

■ A basic purpose of SEPA is to require local governmental agencies, including counties, to consider total environmental and ecological factors to the fullest extent when taking "major actions significantly affecting the quality of the environment". RCW 43.21C.030(2)(c). Such actions require preparation of an EIS. Where, as here, the governmental action consists of issuing permits for a private project, we have employed a two–step analysis in determining whether there is a "major action significantly affecting the quality of the environment". First, the nature or character of the "action" must be considered. Thereafter, the "significance" of the action's impact must be examined to determine its effect on the quality of the environment.

*Eastlake Community Council v. Roanoke Associates, Inc.,*
82 Wn.2d 475, 489–93, 513 P.2d 36, 76 A.L.R.3d 360 (1973).

In regard to the first step of this analysis, a governmental agency's approval of private projects by the granting of permits constitutes an "action" within the meaning of SEPA. *Eastlake Community Council v. Roanoke Associates, Inc., supra* at 489; *see also* WAC 197–10–040(2)(a), SEPA Guidelines, effective January 16, 1976. All parties herein agree that both the county building permit and the substantial development permit under SMA, issued by the Board, constitute "major actions." The fact that the private sector undertakes a project with governmental approval does not lessen the "major" impact of the governmental participation. *Eastlake Community Council v. Roanoke Associates, Inc., supra* at 491.

The SMA, RCW 90.58, though dealing with a limited area of the environment, *i.e.,* the wetlands and adjacent uplands, is no less vigorous than SEPA in declaring a policy aimed at the preservation of our natural resources. In fact, the permit system of the SMA is inextricably interrelated with and supplemented by the requirements of SEPA. *Merkel v. Port of Brownsville,* 8 Wn. App. 844, 850–51, 509 P.2d 390 (1973). The requirements of SEPA clearly overlay the whole SMA permit process. RCW 43.21C.060. Issuance of a substantial development permit under SMA will thus most often require an assessment of the environmental effects of the project. If an assessment leads to the conclusion that the project significantly affects the quality of the environment, an EIS must be prepared. *Juanita Bay Valley Community Ass'n v. Kirkland,* 9 Wn. App. 59, 73, 510 P.2d 1140 (1973).

Therefore, in the instant case we are concerned with the second step of the analysis described above, the "threshold" determination of the project's environmental significance. When a governmental agency makes this initial threshold determination, it must consider the various environmental factors even if it concludes that the action does not significantly affect the environment and therefore

does not require an EIS. *Juanita Bay Valley Community Ass'n v. Kirkland, supra* at 73. We recently stressed the importance of this initial "threshold determination" in *Norway Hill Preservation & Protection Ass'n v. King County Council*, 87 Wn.2d 267, 552 P.2d 674 (1976), where we stated at page 273: "The policy of the act, which is simply to insure via a 'detailed statement' the full disclosure of environmental information so that environmental matters can be given proper consideration during decision making, is thwarted whenever an incorrect 'threshold determination' is made." Therefore, according to *Eastlake* at page 494, if after considering the cumulative effects of the entire project, the government agency makes a determination of no significant impact under SEPA, *i.e.,* a "negative threshold determination," it must show "that environmental factors were considered in a manner sufficient to amount to prima facie compliance with the procedural requirements of SEPA." *Juanita Bay Valley Community Ass'n v. Kirkland, supra* at 73; *Narrowsview Preservation Ass'n v. Tacoma*, 84 Wn.2d 416, 422, 526 P.2d 897 (1974).

█ The scope of judicial review of a governmental determination of "no environmental significance" is extremely broad. The appropriate standard by which to review such administrative decisions is the "clearly erroneous" test. *Norway Hill Preservation & Protection Ass'n v. King County Council, supra* at 274–76. A negative threshold determination is "'. . . "clearly erroneous" if, despite supporting evidence, the reviewing court on the record can firmly conclude "a mistake has been committed."'" *Norway Hill Preservation & Protection Ass'n v. King County Council, supra* at 275, citing *Stempel v. Department of Water Resources*, 82 Wn.2d 109, 114, 508 P.2d 166 (1973). In applying the "clearly erroneous" standard the court is expected to do more than merely determine whether there is substantial evidence to support an administrative or governmental decision. The entire record is opened to judicial scrutiny and the court is required to consider the public policy and environmental values of SEPA as well.

In the present case the trial court did not apply the "clearly erroneous" test to the Board's decision not to require an EIS for the proposed marina. Rather, the court merely concluded that the Board had "substantially complied" with the provisions of SEPA and that its negative threshold determination was "supported by substantial evidence." Such standard of review does not comply with *Norway Hill.*

In reviewing the Board's decision we, as an appellate court, stand in the same position as the trial court. *Farm Supply Distribs., Inc. v. State Util. & Transp. Comm'n,* 83 Wn.2d 446, 448, 518 P.2d 1237 (1974). Consequently, we must apply the "clearly erroneous" test to the Board's decision that the "major action" of issuing the permits was not one "significantly affecting the environment."

■■ As previously noted, all parties agree the Board's issuance of the permits were "major actions." In considering whether "major actions" significantly affect the environment, we have held that an EIS is required "whenever more than a moderate effect on the quality of the environment is a reasonable probability." *Norway Hill Preservation & Protection Ass'n v. King County Council, supra* at 278. Thus, we have reviewed the entire record in the light of the public policy of SEPA to determine whether the construction of respondent's marina will, with reasonable probability, have "more than a moderate effect on the quality of the environment."

As previously indicated, we have held that the record of a negative threshold determination by a governmental agency must "demonstrate that environmental factors were considered in a manner sufficient to amount to prima facie compliance with the procedural requirements of SEPA." *Juanita Bay Valley Community Ass'n v. Kirkland, supra* at 73. With this in mind we are compelled to comment on the inadequacy of the Board's record. It is filled with many assertions, numerous unanswered questions and a paucity of information. Unfortunately the Board's conclusion, supported by a 2–to–1 vote, is accompanied by no reasoning,

explanation or findings of fact, however informal. The minutes of the meeting and the so-called transcript of the public hearing add no clarification. However, one thing does appear from the record as a whole. In reaching the conclusion it did, in the manner it did, the Board misconceived its duty in making the negative threshold determination under the order of remand. This was evidenced at the public hearing, which was held as a direct result of the stipulation between the parties. A representative of the County Planning Department stated:

> We've made this, we've pursued a study of the documents here, and did some findings, and a thorough reading of this chronology section reveals that considerable review of the proposed marina development was made at the State, Local, State and Federal levels prior to the approval of all the regulatory environmentally oriented permits were issued. And from this, it would seem administratively appropriate to recommend that a negative declaration be made, and allow the project to . . . develop, to resume. This presumably would satisfy the procedural requirements of the State Environmental Policy Act.

The summary report of the Planning Department submitted to and apparently used by the Board makes it clear that although a number of federal and state agencies inquired into the environmental impact of the marina, as viewed from their own individual perspective, the Board made no attempt to synthesize or evaluate them, or the information or questions raised by them. Further, while the absence of a final report of the Board and a lack of findings of fact or reasons do not necessarily imply that the Board either ignored or adopted the views of these agencies, it does indicate that the public was denied an opportunity to understand or consider the Board's decision on the application. This lack of explanation in the record also makes it difficult for an appellate court to review the Board's action. It must be remembered that "[t]he SEPA policies of full disclosure and consideration of environmental values require actual consideration of environmental factors *before*

a determination of no environmental significance can be made." (Italics ours.) *Norway Hill Preservation & Protection Ass'n v. King County Council, supra* at 275.[1]

Having reviewed the entire Board record, in light of the public policy of SEPA, to determine whether "a mistake has been committed" in concluding that the marina's construction will have no significant environmental impact on Deer Harbor we are firmly convinced that the decision of the Board was clearly erroneous.

For example, the legal notice published on March 21, 1974, by respondent Carpenter described the project as

a major action significantly affecting the quality of the environment.

At the public hearing local residents expressed concern about water pollution and the flushing effect of the tidal action in Deer Harbor and the lagoon, shellfish and bird life, the impact of traffic and additional population, and the subject of aesthetics (view). These are all legitimate concerns to be considered by a governmental agency in making a threshold determination. However, the County Planning Department admitted it had conducted no field investigation and had no information concerning the proposed marina's impact in these areas. Rather, the County relied on the analyses of several federal and state agencies.

A letter from the Fish and Wildlife Service of the United States Department of Interior considers the upper end of Deer Harbor "biologically unique within the San Juan Islands and deserving of special consideration in any development considered for that vicinity." That agency was concerned about the cumulative effect of more marinas— massive boat parking lots—on the aquatic environment and

---

[1]At the time the instant case was before the Board the present SEPA Guidelines were not in effect. Standard forms including a comprehensive environmental checklist for governmental agencies have now been developed in an effort to provide more adequate review by the judiciary. *See* WAC 197–10–355, –360, –365.

stressed "we think this subject deserves careful examination and thus might appropriately be examined for planning purposes as a general shoreline management issue through the detailed and systematic approach supplied in the EIS procedure."

Some state agencies were in agreement with the Department of the Interior. The Department of Ecology urged that potentially significant environmental effects should be determined before the proposal was approved. The Department of Natural Resources Impact Analysis states the project "will create a considerable impact on the natural environment of the harbor by converting approximately 3 acres of unrestricted navigation use to marina use." This report places special emphasis on the fact that "[the] present scenic, natural view of the upper portion of Deer Harbor" would be replaced by a "man–made view of rows of moored pleasure craft."

A zoological consultant, professor emeritus from the University of Washington, informed the Planning Department by letter that the water and shore areas near the proposed marina were important to both sea and shore birds. He stressed the need to keep pollution to a minimum and expressed the view that too great an increase in boating and human activity would drive many of the birds away. This view raises some serious questions when considered in the light of a feasibility study for a Deer Harbor marina prepared by the United States Army Corps of Engineers. It referred to the harbor as being ideally located for a marina because it was "located in the heavy traffic flow area for boaters."

Further questions are raised by numerous photographs and blueprints found in the Planning Department report to the Board as well as the Department's own comments which state that (1) there are "other choices of action or alternatives available"; (2) the "action involve[s] substantial controversy originating from agencies or citizen

groups"; (3) the action deals with "environmental conditions . . . that have been clearly recognized as being endangered; fragile; in severely short supply; or clearly approaching a precarious level of quality . . ."; (4) environmental effects would be both beneficial and adverse; (5) the environmental effects would be "long term 10–20 years."

The most important aspect of SEPA is full consideration of environmental values, RCW 43.21C.030(2)(b) and this policy is carried out by the EIS procedure. However, the need for an EIS does not mean a proposed project cannot be built. It merely assures a full disclosure and consideration of environmental information prior to the construction of the project. *Norway Hill Preservation & Protection Ass'n v. King County Council, supra* at 272. "It is an attempt by the people to shape their future environment by deliberation, not default." *Stempel v. Department of Water Resources,* 82 Wn.2d 109, 118, 508 P.2d 166 (1973).

Reference to the foregoing examples alone makes it evident that under the stated public policy of SEPA there is a *reasonable probability* that the proposed marina will have *more than a moderate effect* on the quality of the Deer Harbor environment. Based on the entire record and the public policy evinced by SEPA, we are firmly convinced the Board's negative threshold determination was a mistake.

Appellants also contend the public hearing held by the Board violated the appearance of fairness doctrine and that it was necessary to make a complete verbatim record of the hearing.

Inasmuch as WAC 197–10–355, –360, and –365 provide suggested procedures unavailable at the time of the original Board hearing which resulted in a negative threshold determination, and since an EIS has now been ordered, it is unnecessary to reach these procedural issues raised by appellant.

The cause is remanded to the Board for preparation of an EIS.

WRIGHT, C.J., and ROSELLINI, HAMILTON, UTTER, BRACHTENBACH, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.