[No. 45508. En Banc. October 11, 1979.]

ASARCO INCORPORATED, *Respondent,* v. AIR QUALITY
COALITION, ET AL, *Appellants,* PUGET SOUND
AIR POLLUTION CONTROL AGENCY,
*Respondent.*

686

*Michael E. Nelson* and *Deborah A. Shore,* pro se.

*C. John Newlands* and *Robert F. Baker* (of *Eisenhower, Carlson, Newlands, Reha, Henriot & Quinn*), for respondent.

STAFFORD, J.—Appellants Michael Nelson and Deborah Shore obtained direct review of a trial court order which vacated an order of the Pollution Control Hearings Board (PCHB) which had, in turn, vacated a resolution by the Puget Sound Air Pollution Control Agency (PSAPCA) granting ASARCO Incorporated (ASARCO) a variance from PSAPCA's rules and regulations. We reverse the trial court, reinstate the PCHB order, and remand the cause to PSAPCA for further proceedings consistent with this opinion.

PSAPCA is a multi-county corporation with representatives from Pierce, King, Kitsap and Snohomish Counties. The Washington Clean Air Act, RCW 70.94, authorizes and requires PSAPCA to protect the environment from adverse effects of *air pollution* upon public health, safety and property. PSAPCA is further authorized to adopt and enforce air emission standards. To that end PSAPCA adopted Regulation I in 1968. Section 9.07 of that regulation governs emissions of sulphur dioxide ($SO_2$) within PSAPCA's jurisdictional area. This section, as amended in 1970, primarily is directed at controlling emissions from the ASARCO plant in Tacoma. The plant emitted 84 percent of all $SO_2$ emissions within PSAPCA's jurisdictional area at the time section 9.07 was adopted. In 1968 PSAPCA adopted section 9.03 of Regulation I which was designed to govern emissions of all particulate matter. This section, amended in 1973, also was directed primarily at controlling emissions of all particulate matter from ASARCO's Tacoma plant. In September 1973, PSAPCA adopted section 9.19 of Regulation I pertaining to emissions of arsenic-containing

particulate matter. ASARCO's Tacoma plant is the sole source of arsenical emissions within PSAPCA's jurisdictional area and thus is the sole source governed by section 9.19.

In January 1972, ASARCO sought a "variance" claiming it was technologically and economically impossible for the Tacoma plant to operate in compliance with the $SO_2$ regulation. PSAPCA granted the variance and allowed ASARCO to operate its plant without full compliance with the $SO_2$ emissions standards until January 31, 1976.

On December 5, 1975, shortly before the expiration of the first variance, ASARCO submitted to PSAPCA a second or renewed variance application seeking an exemption from compliance with the particulate, arsenical and $SO_2$ emissions standards. We assume the second variance or renewal was applied for pursuant to RCW 70.94.181 which governs the application for and granting of variances.

ASARCO's second application requested a variance for a maximum period of 5 years to permit continued operation of the plant thus justifying the expenditures required for *partial* compliance. ASARCO pledged to spend approximately $7 million to construct an emissions control improvement program. Improvements made pursuant to the program would facilitate complete compliance with arsenical emissions standards and *varying degrees of compliance* with the particulate and $SO_2$ emissions standards. ASARCO testified that the amount of the promised expenditure would be the maximum it could expend for pollution control improvement during the period of the requested variance and that the duration of the requested variance was the time required to construct the improvements in most cases.

PSAPCA studied the application, held public hearings, and, thereafter, in February of 1976, granted a variance ranging from 24 months to 5 years depending upon the type and source of emissions. Emissions of $SO_2$ were exempted from compliance for 5 years. The variance was to expire

December 31, 1980. PSAPCA also was called upon to consider whether an Environmental Impact Statement (EIS) should be furnished prior to issuance of the variance. PSAPCA decided that preparation of an EIS would cause a delay adversely affecting the economic interests of ASARCO without providing a corresponding benefit to the surrounding environment. Thus, PSAPCA ruled, an EIS was not required under the State Environmental Policy Act (SEPA). It is of interest, however, that PSAPCA hedged its position as to the need for an EIS. Section 2 of resolution 359 provides if it "is hereafter determined that an [EIS] is required to be prepared by this Agency, ASARCO will comply with the environmental assessment provision of [SEPA]."

Appellants sought review by the PCHB. ASARCO moved to dismiss the appeal arguing that the PCHB did not have statutory jurisdiction to hear appeals from variances granted by PSAPCA.[1] The PCHB denied ASARCO's motion.

In March 1977, both appellants and ASARCO moved for summary judgment before the PCHB seeking to determine whether PSAPCA should have or did comply with SEPA in granting the variance. Appellants' motion was granted, PSAPCA's variance resolution No. 359 was reversed and the cause was remanded for further proceedings. Subsequently, the trial court entered a judgment vacating PCHB's order 997 and reinstating PSAPCA's variance order of February 1976.

---

[1] It is of passing interest that ASARCO took a position exactly contrary to that argued above. At an earlier stage appellants sought a writ of mandate in Superior Court challenging PSAPCA's failure to require compliance with SEPA before issuing that variance. ASARCO argued successfully (before a different judge) that PCHB was vested with the exclusive power to review PSAPCA variance orders. Agreeing with ASARCO's arguments at that point, the trial court ruled that appellants had not exhausted their administrative remedies before the PCHB and thus dismissed their motion for a writ of mandate. Having now returned to the PCHB appellants are faced with ASARCO's changed contention that the Superior Court, not the PCHB, has exclusive jurisdiction.

The trial court found the variance would have no significant adverse effect on the existing environment but would, in fact, improve the future quality of the environment. The court further found that PSAPCA had considered all significant subjects which would have been included in an EIS had one been required. Thus, according to the trial court, there was only a minimal likelihood of harm due to the absence of an EIS in the decision–making process through which the variance was granted. Further the trial court ruled that PSAPCA had complied with SEPA to the fullest extent possible in considering the variance request and that the preparation of an EIS would have been duplicative of prior actions. Finally, it was found that refusal of a variance until an EIS was prepared would have forced temporary closure of ASARCO's Tacoma plant with attendant economic and social dislocations.

The trial court concluded, as a matter of law, that comparing the asserted minimal likelihood of environmental harm resulting from the absence of an EIS with the claimed economic and social dislocations that would have been occasioned by the delay necessary to prepare an EIS, justified PSAPCA's determination that an EIS was not required. The trial court also concluded that PSAPCA had complied with SEPA, "to the fullest extent possible" and that the variance did not constitute a "major action significantly affecting the quality of the environment" under RCW 43.21C.030. Further, the court held PSAPCA's action in granting the variance constituted the functional equivalent of an EIS. Finally, having found the preparation of an EIS would have taken a minimum of 5 months, the trial court concluded that in the instant case SEPA directly conflicted with the Washington Clean Air Act, RCW 70.94-.181(7). The latter provides "[a]n application for a variance . . . submitted to . . . [PSAPCA] pursuant to this section shall be approved or disapproved by . . . [PSAPCA] within sixty–five days of receipt unless the applicant [ASARCO] and . . . [PSAPCA] agree to a continuance." The trial court held the 65–day limit was mandatory and could not

be waived by PSAPCA.[2] The trial court also concluded, as a matter of law, that the PCHB had no jurisdiction to hear and decide appeals from orders or decisions of PSAPCA on applications for variances. We reverse the trial court.

JURISDICTION OF THE PCHB TO HEAR AND DECIDE APPEALS FROM DECISIONS OF AIR POLLUTION CONTROL AUTHORITIES GRANTING VARIANCES FROM ITS RULES AND REGULATIONS

The trial court concluded, as a matter of law, that the PCHB "does not have jurisdiction under RCW 70.94, RCW 43.21B, or RCW 43.21C to hear and decide appeals of orders or decisions by PSAPCA . . . which concern or grant variances . . . including orders and decisions made by PSAPCA . . . pursuant to chapter 43.21C RCW in connection with PSAPCA's granting of a variance." Based on the foregoing, and other holdings to be discussed hereafter, the trial court reversed the PCHB's summary order reversing PSAPCA's resolution 359 which granted the variance. In support of the trial court's holding, ASARCO contends that jurisdiction to hear and decide appeals from PSAPCA's orders or decisions granting variances rests exclusively with the superior courts and that the sole effect of RCW 43.21B is to give PCHB jurisdiction over PSAPCA in regard to appeals from violation orders only. We do not agree and reverse the trial court on this issue.

---

[2]We note with interest that while both the trial court and ASARCO assert the 65–day provision of RCW 70.94.181(7) is mandatory, both ignore the fact that ASARCO itself failed to comply with subsection (4) of the same section which provides:

No renewal shall be granted except on application therefor. Any such application shall be made *at least sixty days prior to the expiration of the variance.*

(Italics ours.) At least as to the requested 5–year variance for $SO_2$ emissions, ASARCO's current application was, in actuality, for a renewal of the 1972 variance from compliance with PSAPCA's Regulation I, § 9.07. We have not been informed why emphasis has been placed on the claimed mandatory effect of subsection (7) but not on subsection (4).

The purpose of the PCHB is:

[T]o provide for a more expeditious and efficient disposition of appeals with respect to . . . *all decisions of air pollution control boards* or authorities . . .

(Italics ours.) RCW 43.21B.010.

RCW 43.21B.110 provides for the manner in which appeals before the PCHB shall be carried out so as to effectuate the purpose reflected by RCW 43.21B.010 above.

The hearings board [PCHB] *shall only have jurisdiction to hear and decide appeals from the decisions of . . . the air pollution control boards* [PSAPCA] *when such decisions concern matters within the jurisdiction of the hearings board as provided in this act . . . The hearings board shall also have jurisdiction to hear and decide appeals from any person aggrieved by an order issued by . . . air pollution control boards . . . with respect to a violation or violations of this act* or of any rule or regulation adopted by the department [Department of Ecology] or of any other law within the jurisdiction of the department. . . . *Provided,* That review of rules and regulations adopted by the [hearings] board shall be subject to review in accordance with . . . the administrative procedures act . . .

(Italics ours.)

■ Inasmuch as RCW 43.21B.110 grants the PCHB jurisdiction *to hear and decide appeals from decisions of PSAPCA only as provided in the act,* the first issue to be resolved is the source of the act's grant of jurisdiction to the PCHB over decisions of the air pollution control boards or authorities, *i.e.,* PSAPCA. It should be noted that RCW 43.21B.110 not only provides that the PCHB has jurisdiction to hear and decide appeals from PSAPCA's decisions but provides that the PCHB *also* has jurisdiction to hear and decide appeals from any person aggrieved by an order issued by PSAPCA with respect to a violation of the act or any rule or regulation adopted by the Department of Ecology (DOE). Inclusion of the word "also" destroys ASARCO's contention that PCHB's jurisdiction over PSAPCA is limited to violations since the language of the statute makes clear the fact that jurisdiction over violations

is *in addition* to jurisdiction over other decisions by air pollution control agencies. In fact, RCW 43.21B.120 gives the PCHB jurisdiction to hear and decide appeals pertaining to violations of any rule or regulation made by DOE or adopted by PSAPCA thus wisely eliminating possible conflicts of interest that might occur with "in–house decisions" made by DOE or PSAPCA involving violations of their own rules and regulations. Insofar as the instant issues are concerned, and contrary to the position taken by the trial court and ASARCO, judicial review through the administrative procedures act is applicable only to review of rules and regulations adopted by the PCHB. RCW 43.21B.110. RCW 43.21B.110 and .130 thus prevent "in–house decisions" by the PCHB when its own rules and regulations are concerned. This limitation placed on PCHB hearings, however, is not relevant to appeals *to* the PCHB from decisions of PSAPCA or orders of PSAPCA relating to violations of the act or violations of DOE or PSAPCA rules and regulations. *See* RCW 43.21B.120, .130.

Turning specifically to the jurisdiction of the PCHB to hear appeals from decisions and orders of PSAPCA, RCW 43.21B.130 provides as follows:

> *all decisions of air pollution control boards* or authorities [PSAPCA] . . . *shall be subject to review by the hearings board* [PCHB] . . .

(Italics ours.) In light of the act's specific grant of jurisdiction to hearings boards over appeals from all decisions of air pollution control agencies, we hold the PCHB had jurisdiction over an appeal from the granting of a variance, which clearly involved a decision of PSAPCA. *State ex rel. Martin Marietta Aluminum, Inc. v. Woodward,* 84 Wn.2d 329, 525 P.2d 247 (1974), cited by neither party, is in agreement with this position and is determinative of the jurisdictional issue. At page 332 *Woodward* makes it abundantly clear that the PCHB has "appellate jurisdiction not only of orders of violations, but also over all decisions of DOE, its director and the pollution control boards and authorities" such as PSAPCA. As we stated in *Woodward*

at page 333, the legislative grant of such jurisdiction is logical:

[U]niform, independent review of not only the actions of the DOE but all the air pollution boards [PSAPCA] is patently preferable to fragmented and perhaps uneven results among the various superior courts in our 39 counties. Uniformity in administering the vast powers granted under our strong environmental and pollution control laws is an apparent and desirable goal of this act. That goal would be frustrated if the ultimate interpretation is vested in the several superior courts and their juries.

ASARCO argues that all of the foregoing is inconsistent with RCW 70.94.181(5) which it claims provides for judicial review under the provisions of the administrative procedures act. We do not agree. RCW 70.94.181(5), a part of the Washington Clean Air Act, states "any *applicant* adversely affected by the denial or the terms and conditions of the granting of an application for a variance or renewal of a variance by the . . . board [the board of directors of an air pollution control agency] may obtain judicial review thereof . . ." (Italics ours.) In the instant case the review was sought not by the applicant, but by appellants who are resisting ASARCO's (*i.e*, the applicant's) request. Thus, RCW 70.94.181(5) is not applicable to the instant case.

The trial court is reversed on this issue.

### SUMMARY JUDGMENT

ASARCO and appellants each moved for a partial summary judgment from the PCHB. Neither challenged the jurisdiction or authority of the PCHB to employ such summary procedures. PCHB's order No. 997 denied ASARCO's motion and granted appellants' motion based on PSAPCA's failure to prepare an EIS. As a result, PSAPCA's resolution 359 was reversed and the cause was remanded for further proceedings consistent with the PCHB's order. The trial court, acting sua sponte, reversed the PCHB's order granting a partial summary judgment. In so doing it held that "[t]he power to grant judgments is exclusively reserved for

the judiciary pursuant to the Washington State Constitution." Thus, the trial court volunteered, the PCHB had no authority or jurisdiction to grant any type of judgment including a summary judgment. We do not agree and reverse the trial court on this issue.

Undoubtedly the trial court's position is based upon a separation of powers concept considered and rejected by most courts in the early days of administrative practice. In the past the fact that agencies were an extension of the legislative arm of government made it difficult for many courts to accept the idea that some agencies could constitutionally act in a quasi–judicial capacity. Today a majority of the courts, including the United States Supreme Court and our own, agree that legislatively created agencies may constitutionally act in such a capacity. *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 84 L. Ed. 1263, 60 S. Ct. 907 (1940); *Rody v. Hollis,* 81 Wn.2d 88, 500 P.2d 97 (1972); *Floyd v. Department of Labor & Indus.,* 44 Wn.2d 560, 269 P.2d 563 (1954).

Contrary to the trial court's position, neither Const. art. 4 nor the Superior Court Civil Rules provides that the power to grant judgments (and thus to grant summary judgments) is *exclusively* reserved to the judiciary. To so hold would require a return to a view long rejected by this court. It would necessitate holding that the legislature has no power to create administrative boards and agencies, such as the PCHB, which have quasi–judicial authority. This we will not do at such a late date in the absence of some good reason.

█ Since Const. art. 4 and the Superior Court Civil Rules do not exclusively reserve summary procedures to the judiciary, there is no logic that compels us to consider separation of powers as a roadblock to the use of efficient judicial procedures in the field of administrative law. If there does not exist a genuine issue of material fact, there is no reason why an administrative board or agency should be denied an opportunity to handle the matter summarily,

passing on the issue of law presented. *Persian Gulf Outward Freight Conf. v. Federal Maritime Comm'n,* 375 F.2d 335 (D.C. Cir. 1967); *Mississippi River Fuel Corp. v. Federal Power Comm'n,* 281 F.2d 919, 927 (D.C. Cir. 1960); *Sun Oil Co. v. Federal Power Comm'n,* 256 F.2d 233 (5th Cir. 1958); *Producers Livestock Mktg. Ass'n v. United States,* 241 F.2d 192, 196 (10th Cir. 1957); *see also* K. Davis, *Administrative Law Text* § 7.02, at 158, 159 (3d ed. 1972); 4 Mezines, Stein & Gruff, *Administrative Law* § 37.02(7), at 37–14 n.59–60 (1979). To reject administrative use of such an efficient judicial tool because it is denominated a "summary judgment" rather than a "summary decision" or "summary order" would be to elevate form over substance.[3] Thus, we hold that a legislatively created agency or board, when acting in a quasi–judicial capacity, may employ summary procedure if there is no genuine issue of material fact.[4] Further, in addition to the absence of a challenge by any party to the use of summary procedure (all parties having moved for summary judgment), none of the contending parties asserts there is any genuine issue of material fact on the issue for which the procedure was employed.

■ The source of a board or agency's powers and duties is statutory. Thus, it is for the legislature to decide whether one agency may review the acts of another, the extent of that review, whether an agency or board may have its decisions or orders reviewed judicially, and at what stage of the proceeding. *State ex rel. Hood v. Personnel Bd.,* 82 Wn.2d 396, 511 P.2d 52 (1973). As discussed more fully above, the PCHB has a duty to entertain appeals from all decisions of

---

[3]Even if form were deemed an overriding consideration, it must be observed the PCHB did not actually dispose of any issues by means of a summary judgment. The contesting parties all moved for a summary judgment. But in disposing of their motions, the PCHB denied one and granted the other motion by means of an *order* as distinguished from a judgment.

[4]We do not resolve the broad issue encompassing judgments in general. That is not before us. We pass only on the employment of summary procedures by boards and agencies when there is no genuine issue of material fact.

PSAPCA. RCW 43.21B.010. It is empowered to enact rules of practice and procedure for conducting its hearings. Based upon the hearings, findings of fact are derived upon which are based written orders and decisions on all appeals resolved by the PCHB. RCW 43.21B.010, .090, .100, .110, .120. Nothing is contained in these broad powers, or in WAC 371-08-145, 150, 180, 185, 186 and 187 promulgated pursuant to statute, that is inconsistent with the PCHB disposing of legal issues by summary procedure when there is no genuine issue of material fact.

The trial court erred in reversing the PCHB's order granting summary disposition of an appeal from PSAPCA's variance of its rules and regulations. The trial court is reversed on this issue.

### ENVIRONMENTAL IMPACT STATEMENT

The PCHB granted appellants' motion for summary judgment holding PSAPCA had erred in deciding that the variance requested would have no significant impact on the environment (*i.e.,* in making a "negative threshold determination") and thus would not require an EIS. PSAPCA's decision therefore was reversed and the matter was remanded to that agency for the preparation of an EIS. The trial court in turn reversed the PCHB finding:

> The variance will not have a significant or adversed affect [*sic*] on the existing environment. The variance will not cause a change in the use of the environment affected by the operations of the Tacoma Plant. The variance will cause the environment to be improved by virtue of ASARCO's implementing the improvement program as required by the variance.

Finding of fact No. 25. Appellants assigned error to this finding[5] and claim that prior to making a decision on

---

[5]Respondent challenges this assignment of error as failing to satisfy RAP 10.3(a)(3) and RAP 10.3(g) because it relates only to the trial court's determination that an EIS was not required prior to the issuance of this particular variance and not to the larger question of whether such a variance was subject to SEPA.

ASARCO's request for a variance, PSAPCA should have prepared an EIS outlining the environmental cost of allowing emissions in excess of PSAPCA's regulation levels for an additional 5 years.

Whether an EIS should have been prepared in the instant case involves two independent questions: (1) did SEPA, viewed in isolation, mandate the preparation of an EIS *before* the decision on this variance request was made; (2) do the requirements of SEPA so conflict with other state and federal environmental laws that its application in the instant case would have been impossible or impractical?

I. Did SEPA require preparation of an EIS prior to a variance decision in the instant case?

RCW 43.21C.030, which lies at the heart of this issue, provides:

The legislature authorizes and directs that, *to the fullest extent possible*:. . . (2) all branches of government of this state, *including state agencies*, municipal and public corporations, and counties shall:

. . .

(c) Include in every recommendation or report on proposals for legislation and other *major actions significantly affecting the quality of the environment*, a detailed statement by the responsible official on:
(i) the environmental impact of the proposed action[.]

(Italics ours.)

---

Respondent further contends that no separate assignment of error was made to the conclusion of law that PSAPCA was exempt from the SEPA requirements.

RAP 10.3(g) states:

The appellate court will only review a claimed error which is included in an assignment of error *or clearly disclosed in the associated issue pertaining thereto*.

(Italics ours.) The issue of SEPA's applicability to the instant variance is complex and involves numerous subissues. Although the preferable method would have been to assign error to all the findings and conclusions related to SEPA, the assignment above and the argument presented in appellants' brief provided adequate notice to respondent and sufficiently called the issues presented to our attention.

■ The PCHB correctly concluded that PSAPCA's decision to grant a variance through resolution 359 constituted, in effect, a determination that the granting of a variance without an EIS was consistent with the public's right to a healthful environment and with the policies of SEPA. This amounted to a "negative threshold determination" that an EIS was not mandated by RCW 43.21C.030. As we said in *Leschi Improvement Council v. State Highway Comm'n,* 84 Wn.2d 271, 285, 525 P.2d 774 (1974):

> [U]nder SEPA an agency's decision to approve a project impliedly, if not expressly, determines that the project is consistent with the citizen's fundamental right to a healthful environment and with the legislatively mandated policy that an agency action allow to citizens the widest practicable range of beneficial uses of the environment without degradation.

The standard for review of a "negative threshold determination" is whether the agency's decision is "clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order". RCW 34.04.130(6)(e); *Sisley v. San Juan County,* 89 Wn.2d 78, 569 P.2d 712 (1977); *Norway Hill Preservation & Protection Ass'n v. King County Council,* 87 Wn.2d 267, 552 P.2d 674 (1976). The reason for this broad scope of review is clear.

> The *policy of the act,* which is simply to insure via a "detailed statement" the full disclosure of environmental information so that environmental matters can be given proper consideration during decision making, *is thwarted whenever an incorrect "threshold determination" is made.* The determination that an action is not a "major action significantly affecting the quality of the environment" means that the detailed impact statement of SEPA is not required before the action is taken or the decision is made.

(Italics ours.) *Norway Hill,* 87 Wn.2d at 273. *See Sisley v. San Juan County, supra* at 84. The purpose of the broad scope of review is to ensure that an agency, in considering the need for an EIS, does not yield to the temptation of

expediency thus short–circuiting the thoughtful decision–making process contemplated by SEPA.

■ The procedural mandate of SEPA requiring preparation of an EIS is triggered by a "major action significantly affecting the quality of the environment." RCW 43.21C.030(2)(c). An action is "major", within the meaning of RCW 43.21C.030, if it involves a "discretionary, nonduplicative" decision by the agency. *Eastlake Community Council v. Roanoke Assocs., Inc.,* 82 Wn.2d 475, 488, 513 P.2d 36, 76 A.L.R.3d 360 (1973). As we said in *Loveless v. Yantis,* 82 Wn.2d 754, 764, 513 P.2d 1023 (1973) in discussing "major action":

> In *Eastlake . . .* we set forth the elements necessary to establish a "major action." We therein indicated that if the governmental action "involved a discretionary non-duplicative stage" of the government's approval, SEPA would apply where the considered project significantly affects the environment.

PSAPCA had authority to either grant or deny ASARCO's request for a variance. Clearly the decision to grant it was a "discretionary act" within the purview of *Loveless.* The next question, then, is whether the action of PSAPCA was also "nonduplicative" so as to be characterized as "major". We hold that, although an earlier variance sought by ASARCO was granted by PSAPCA in 1972, the decision on the second or renewed variance was "nonduplicative." No EIS was prepared and the record does not indicate that the environmental costs of the earlier variance were fully considered at the time. Thus, there is no conflict with the dictate of *Loveless v. Yantis, supra* at 764–65 wherein we said:

> [I]f environmental issues have previously been considered or no new information or developments have intervened since the last "major action", *a new or revised impact statement* is not necessary. SEPA does not mandate bureaucratic redundancy but only that the heretofore ignored environmental considerations become part of normal decision making on major actions.

(Italics ours.) PSAPCA's decision here was "nonduplicative" and thus must be characterized as a "major action" under RCW 43.21C.030(2)(c).

■ Our next inquiry is whether the action taken by PSAPCA, at ASARCO's request, "significantly affected" the quality of the environment. A significant impact is established "whenever *more than a moderate effect* on the quality of the environment *is a reasonable probability.*" (Italics ours.) *Norway Hill,* 87 Wn.2d at 278; *Swift v. Island County,* 87 Wn.2d 348, 358, 552 P.2d 175 (1976). Where an agency finding of "no significant environmental impact" has been challenged, the scope of review is broad and the search for factors indicating more than a moderate effect on the environment must be considered in light of the public policy of SEPA. *Sisley v. San Juan County, supra* at 84.

ASARCO's plant, for which the variance is sought, is located in Tacoma. It is a custom smelter of arsenic–laden copper ores. The smelting process produces approximately 11,000 tons of arsenic trioxide each year as a by–product. In 1975, the year in which ASARCO sought the variance at issue here, the Tacoma plant annually emitted into the surrounding atmosphere 238 *tons* of arsenic trioxide, 1,286 *tons* of total particulate matter and 89,000 *tons* of $SO_2$.

The plant is located within the jurisdiction of PSAPCA and, therefore, is subject to that agency's regulations. PSAPCA was established pursuant to the Washington Clean Air Act, RCW 70.94, and pursuant to that act, PSAPCA promulgated Regulation I in 1968. The policy motivating the adoption of the regulation was:

> to secure and maintain such levels of air quality as will protect human health and safety and, to the greatest degree practicable, prevent injury to plant and animal life and to property, foster the comfort and convenience of its inhabitants, seek public participation in policy planning and implementation, promote the economic and social development of the Puget Sound area and facilitate the enjoyment of the Puget Sound area.

Article 7 of Regulation I outlines PSAPCA's authority to consider variances from the emission levels established by it. For the most part the article reiterates the language of RCW 70.94.181.

ASARCO sought the instant variance pursuant to section 7.01 of Regulation I. Under the terms of the requested variance, emissions from the plant's main stack would be permitted to continue in violation of PSAPCA's standards for 24 months. ASARCO predicted that during this period approximately *one–half ton* of suspended particulate would be emitted from the main stack *per day*. Phrased another way, by ASARCO's admission, the average opacity of the main stack would be 30 percent while section 9.03(b) of Regulation I requires no greater than 20 percent opacity. At the end of the 24–month period, ASARCO's main stack was to be in full compliance with section 9.03(b). The variance application further requested that the anode furnaces be exempt from section 9.03(b) for 32 months. During those months the furnaces would emit *four–tenths ton* of suspended particulate *per day*. At the end of the 32–month period, ASARCO planned to be in full compliance with section 9.03(b). The variance application also requested a 5–year exemption from regulations limiting particulate emissions from low–level sources. During this 5–year period, such emissions would decrease from *1.89 to 1.25 tons per day*. At the end of that period ASARCO predicted it would *still be unable to comply with section 9.03(b)* but the incidence of noncompliance would be reduced. Finally, the variance would allow exemption from the limitations on $SO_2$ emission (section 9.07(a)) for 5 years. During this period, *244 tons* of $SO_2$ *per day* would be emitted. At the end of the period, ASARCO *still would not comply with section 9.07*.

Section 7.01 requires PSAPCA to make two findings before granting a variance request.

(1) The emissions occurring or proposed to occur do not endanger public health and safety; and (2) compliance with the rules or regulations from which the variance is

sought would produce serious hardship without equal or greater benefits to the public.

PSAPCA made both findings before granting the variance. After reviewing the testimony and evidence before PSAPCA, the PCHB concluded PSAPCA's decision not to prepare an EIS was clearly erroneous in view of the entire record and the public policy of SEPA. The PCHB stated:

> These emissions to the ambient air pose possible adverse effects of unknown dimensions over a large geographic area which affect air, land and water . . . The variance granted would allow the emissions to continue above and in excess of that allowed by regulation for up to five years. We believe that there is a *reasonable probability,* on its face, *that the variance* granted *would have more than a moderate effect on the quality of the environment.*

(Italics ours.) PCHB Order, at 15–16. The decision of the PCHB was later reversed by the trial court.

We reverse the trial court and uphold the PCHB's determination that there is a reasonable probability PSAPCA's variance would have a significant adverse impact on the quality of the environment. PSAPCA promulgated the emission levels in a statutorily mandated effort to protect the health of plant, animal and human life as well as the quality of the environment. A variance request seeking to considerably exceed such limits for up to 5 years, in itself suggests a reasonable probability that the quality of the environment will be at least moderately affected. In addition, during a lengthy public hearing, medical testimony was presented to PSAPCA on the potential for serious health problems caused by the pollutants among residents in the area, particularly children attending schools in the vicinity of the plant. PSAPCA heard testimony that high concentrations of $SO_2$ in the air are linked to an increase in the rate of illness and death among those breathing it over an extended period of time. Most vulnerable are the young, the elderly, and those already ill with lung or heart disease. Other medical testimony suggested that actual damage to health from the emissions could not

be proven conclusively. But, nearly all scientists who testified stated they lacked sufficient factual data to evaluate thoroughly the effect of granting the variance. Finally, ASARCO does not appear to seriously contend the emissions allowed by the variance will not significantly affect the environment. Rather, testimony presented by ASARCO at the PSAPCA hearing emphasizes the adverse economic impact the denial of a variance would have on ASARCO and the Tacoma community and the adverse impact it would have on proposed improvements in pollution control that could be accomplished during the variance period. While such considerations are important in evaluating the variance request, they do not diminish the potential environmental effects of continued emissions in excess of those permitted by PSAPCA's regulations.

Considering the testimony presented before PSAPCA, in light of the public policy of SEPA, we hold that there is a reasonable probability of a moderate effect on the quality of the environment as a result of granting the variance. Thus, the effect must be said to be "significant."

■ ASARCO contends the granting of a variance cannot properly be characterized as a major action significantly affecting the environment under RCW 43.21C.030 because granting the variance simply maintained the status quo. In support of this contention, respondent cites *Narrowsview Preserv. Ass'n v. Tacoma,* 84 Wn.2d 416, 526 P.2d 897 (1974) and *Marino Prop. Co. v. Port of Seattle,* 88 Wn.2d 822, 567 P.2d 1125 (1977). In *Narrowsview* we stated at page 423:

the term "significantly" has been defined to include the examination of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area, and (2) the absolute quantitative adverse environmental effects of the action itself, *including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area.*

(Italics ours.) *Narrowsview* involved a proposed rezoning of certain property in Tacoma from single–family dwelling to planned residential development. We recognized in *Narrowsview,* at page 424, that, in certain cases including the challenged rezone, it might be entirely proper for a governmental agency to

> determine that [the *act* of making] a change in the zoning would not have a substantial impact on the environment, based upon the information available, when examined in relation to those uses already allowed by existing zoning and yet to require an environmental impact statement at such [later] time as a preliminary plat or building permit was issued for a specific project when details of the specific structure and use of the property are more clearly defined.

*Marino* involved the reacquisition of certain property and the taking over of an existing use of certain piers by the Port of Seattle. We held that a mere change in the *ownership* of property, where the *use* of the property remained unchanged, would not have an effect on the quality of the environment and thus is not a "major action" which mandated preparation of an EIS. *Marino v. Port of Seattle, supra* at 831.

The factual settings of both *Narrowsview* and *Marino* distinguish them from this case and compel a different legal result. The proposed action in those cases changed neither the actual current *uses to which the land was put nor the impact of continued use on the surrounding environment.* Such is not the case here. ASARCO asserts the granting of the variance would not change the emission levels in effect prior to the variance requested and thus would maintain the status quo. However, ASARCO's contention obscures the fact that the existing levels were themselves in violation of PSAPCA's Regulation I. The requested variance, far from maintaining the environmental status quo as envisioned by either Regulation I or SEPA, would maintain the status quo of an admitted violation. It would permit the continued impact of high levels of emissions which, cumulatively, would be much greater than that ever authorized

by PSAPCA's Regulation I. Rather than maintaining the status quo, the granting of the variance potentially would increase the pace of environmental degradation. This is precisely the danger sought to be avoided by the legislature in enacting SEPA. Our conclusion is consistent with the purpose underlying SEPA which aims not only to prevent further environmental degradation *but to reverse,* where possible, *ecological damage already done.*

> The "continuing" policy and responsibility of the state is not only to *maintain* and *enhance* our environment, but to also "*prevent* or *eliminate* damage to the environment" and "*restore*" it.

*Eastlake Community Council v. Roanoke Assocs., Inc.,* 82 Wn.2d 475, 490, 513 P.2d 36, 76 A.L.R.3d 360 (1973).

We hold that PSAPCA's issuance of a 5–year variance was a "major action significantly affecting the quality of the environment". As such it triggered the EIS requirements of SEPA. We hold further that PSAPCA's issuance of the variance was clearly erroneous in view of the entire record as submitted and the public policy contained in SEPA. Consequently, the trial court's judgment affirming PSAPCA's action is in error.

## II. Does SEPA conflict with other State and Federal Environmental Laws?

ASARCO contends the EIS provision of SEPA so irreconcilably conflicts with the requirements of the Washington Clean Air Act, RCW 70.94, that SEPA is inapplicable to variance decisions made pursuant to that Act.

RCW 70.94.181(7), enacted in 1974, states:

> An application for a variance, or for the renewal thereof, submitted to the department of ecology or board pursuant to this section shall be approved or disapproved by the department or board *within sixty–five days* of receipt unless the applicant and the department of ecology or board agree to a continuance.

(Italics ours.)

ASARCO claims, PCHB accepted and the trial court found that preparation of an EIS would have taken a minimum of 5 months. Therefore, ASARCO contends, compliance with both the 65–day limitation in RCW 70.94.181 and SEPA is impossible.[6]

 First, ASARCO contends the EIS requirement of SEPA was impliedly repealed by RCW 70.94.181(7). We do not agree. As we said in *Stephens v. Stephens,* 85 Wn.2d 290, 295, 534 P.2d 571 (1975):

> Statutes are impliedly repealed by later acts only if "(1) the later act covers the entire subject matter of the earlier legislation, is complete in itself, and is evidently intended to supersede prior legislation on the subject; or (2) the two acts are so clearly inconsistent with, and repugnant to, each other that they cannot be reconciled and both given effect by a fair and reasonable construction."

The above stated rule does not support repeal by implication in the instant case. The later act, *i.e.,* the Washington Clean Air Act, does not cover the entire subject matter of SEPA since it is designed to prevent destruction or degradation of *air quality* alone. There is no evidence the legislature intended the Washington Clean Air Act to supersede SEPA's broad environmental protection requirements. As will be discussed below, the two acts can be reasonably reconciled so as to give effect to both.

Second, ASARCO contends the variances sought under RCW 70.94.181 are exempt from EIS requirements under the reasoning of *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n,* 426 U.S. 776, 49 L. Ed. 2d 205, 96 S. Ct. 2430 (1976). We do not agree. The issue in *Flint Ridge* was whether the National Environmental Policy Act of 1969, 42 U.S.C. § 7410 *et seq.* (NEPA) required the Department of Housing and Urban Development (HUD) to prepare an EIS before

---

[6]The potential conflict between the requirement of an EIS and the 65–day rule of the Clean Air Act does not appear to have been considered by PSAPCA. It is of interest that the PCHB held the two did not conflict by interpreting the word "shall" as mandatory in RCW 43.21C.030 and as directory in RCW 70.94-.181(7).

it could register a disclosure statement filed by a private developer. The disclosure statement was required to be filed pursuant to the Interstate Land Sales Full Disclosure Act and automatically became effective 30 days after filing unless the Secretary determined it was incomplete or materially inaccurate. The court held in *Flint Ridge,* at page 791, that where a clear and unavoidable conflict in statutory authority exists, NEPA must yield.

A number of distinctions between *Flint Ridge* and the instant case support a result contrary to that urged by ASARCO. First, the Federal Disclosure Act did not leave the Secretary discretion to suspend the effective date of the statement except in the *sole event* it was either incomplete or inaccurate. In contrast, PSAPCA has considerable discretion in the disposition of a variance application. The application can be granted, denied, or a continuance granted. RCW 70.94.181. Second, the Federal Disclosure Act is designed to prevent false and deceptive practices in the sale of unimproved tracts of land. The Washington Clean Air Act is designed to secure and maintain beneficial levels of air quality. Therefore, PSAPCA is prepared to deal with environmental issues where HUD is not. Finally, while NEPA and SEPA are substantially similar in intent and effect, we have held that the public policy behind SEPA is considerably stronger than that behind NEPA.

> The right . . . to a "healthful environment" is expressly recognized as a "fundamental and inalienable" right by the language of SEPA. The choice of this language in SEPA indicates in the strongest possible terms the basic importance of environmental concerns to the people of this state. It is a far stronger policy statement than that found in the National Environmental Policy Act which reads only that "The Congress recognizes that each person should enjoy a healthful environment . . ." 42 U.S.C. § 4331(c).

*Leschi Improvement Council v. State Highway Comm'n,* 84 Wn.2d 271, 279–80, 525 P.2d 774 (1974). In light of these distinctions, we hold there is not a clear and fundamental

conflict between PSAPCA's statutory duties under SEPA and the Washington Clean Air Act.

RCW 70.94.181(7) requires PSAPCA to take action on a variance request within 65 days of the time a completed application is submitted. The 65–day rule must be read in the full context of RCW 70.94.181. That statute clearly outlines how such variance requests are to be sought and for what reasons, under what circumstances variance requests may be granted, and what factors the agency reviewing the request is to consider. RCW 70.94.181(1) not only requires the filing of a variance application, but also states: "The application shall be accompanied by such information and data as the department of ecology or board may require." The statute further mandates that a public hearing be held or due notice provided before a variance decision is made and that the agency make specific findings regarding the broad effects of granting a variance request. RCW 70.94.181(1)(a), (b). It is clear from a careful reading of RCW 70.94.181 and of the Washington Clean Air Act as a whole that the legislature intended the consideration of variance requests to be a thoughtful and deliberate process. Such an intention can be reconciled with the 65–day requirement.

Where PSAPCA determines that a variance sought, if granted, will require the preparation of an EIS, it may proceed in either of two ways under RCW 70.94.181. It may treat the application for a variance as incomplete, pursuant to the agency's authority under RCW 70.94.181(1), until such time as the information necessary for completion of an EIS accompanies the application. The 65–day requirement would begin to run only when the application, complete with such required supplementary information, is filed. Second, the agency may request a continuance under RCW 70.94.181 until such time as an EIS can be prepared.

By allowing the agency an opportunity to consider thoroughly all information available on the environmental, technological and economic effects of granting a variance from its air pollution regulations, the strong policy behind

both SEPA and the Washington Clean Air Act is furthered. We note the Council on Environmental Policy, created by the legislature to adopt rules for the implementation of SEPA, promulgated guidelines effective July 1976. One such guideline exempts from the requirements of SEPA variances under the state Clean Air Act *which are for 1 year or less.* WAC 197–10–170(13). While this guideline is not applicable to the instant case, it will solve any question that might be raised in the future concerning the interrelationship of the EIS requirements of SEPA and the 65–day requirement of the Washington Clean Air Act.

Next ASARCO contends that preparation of an EIS would prevent the improvement of air quality contrary to the express purpose of the Washington Clean Air Act, RCW 70.94.011, and federal law. The federal Clean Air Act directs each state to submit to the Environmental Protection Agency (EPA) a state implementation plan which must contain certain regulations designed to attain and maintain particular national air quality standards. PSAPCA's regulations are included in Washington's plan which was accepted by the EPA in 1972. ASARCO contends its compliance with PSAPCA's regulations was required in order for ASARCO and PSAPCA to comply with federal law. ASARCO argues that unless the variance was granted or the plant shut down, it could not have complied with federal law.

ASARCO's argument fails to recognize that PSAPCA's 5–year variance also does not comply with federal law. The improvements required by the variance, while diminishing the level of pollution, will not bring the smelter into compliance with either PSAPCA's regulations or with federal law. As we will discuss in detail later, the requiring of an EIS does not assure the granting or denial of a variance. An EIS simply assures that the environmental costs will be fully considered when the ultimate decision is made by PSAPCA. Thus, it has little real impact on the question of compliance with either the federal or state Clean Air Act.

Finally, ASARCO contends PSAPCA's variance decision is exempt from SEPA because the procedures mandated by the Washington Clean Air Act are the functional equivalent of an EIS. The trial court made a finding to this general effect. In support of this contention, ASARCO cites a number of federal cases which hold that the EPA is not subject to the EIS requirements of NEPA because the federal Clean Air Act requires that the EPA perform the "functional equivalent" of the EIS procedures. *Amoco Oil Co. v. Environmental Protection Agency,* 501 F.2d 722, 740 (D.C. Cir. 1974); *Buckeye Power, Inc. v. Environmental Protection Agency,* 481 F.2d 162 (6th Cir. 1973); *Duquesne Light Co. v. Environmental Protection Agency,* 481 F.2d 1 (3d Cir. 1973); *International Harvester Co. v. Ruckelshaus,* 478 F.2d 615 (D.C. Cir. 1973). The rationale behind these holdings is that duplicative efforts would be expensive, time–consuming and serve no general purpose. ASARCO argues that the same reasoning should be employed here since PSAPCA must investigate the technological, economic and environmental implications of the variance as well as assess any dangers to public health, safety and property. RCW 70.94.181. We do not agree.

We have not heretofore adopted the doctrine of functional equivalency and, in light of the facts presented here, we do not adopt it at this time. PSAPCA is an *air* pollution control agency. The agency's jurisdiction is limited to air pollution, yet the requested variance may have long–term effects on the *land* and *water* of the region as well as on the air. The EPA has much broader environmental responsibility than PSAPCA and therefore is equipped to evaluate the full range of potential environmental effects of air pollution. Thus the federal cases are not applicable to the issue before us.

PSAPCA's Regulation I and SEPA's requirement of an EIS were designed to protect the public and the environment from the effects of pollution. Throughout each stage of this proceeding ASARCO has argued that any delay

caused by the preparation of an EIS could result in closure of its plant. ASARCO even suggests parenthetically that full compliance with Regulation I might cause the same result in any event. Thus, ASARCO seems to argue that it must be permitted to violate basic environmental regulations or it may close its plant because of the high cost of compliance. This, it is asserted, will cause attendant economic dislocation both within the plant and throughout the Tacoma area. It is of interest, however, that ASARCO has devoted little attention to any real discussion of whether compliance with Regulation I and SEPA is beyond the technological knowledge of the industry. Almost total emphasis is placed on the economic impact ASARCO may suffer if it complies as well as the possible economic impact on the Tacoma area if ASARCO's wishes are not granted. This singular type of approach does not solve the problem under either Regulation I or SEPA.

 Our holding that an EIS is required in the instant case does not mean the variance cannot be granted.

The most important aspect of SEPA is full consideration of environmental values, RCW 43.21C.030(2)(b) and this policy is carried out by the EIS procedure. However, the need for an EIS does not mean a proposed project cannot be built. It merely assures a full disclosure and consideration of environmental information prior to the construction of the project.

*Sisley v. San Juan County,* 89 Wn.2d 78, 89, 569 P.2d 712 (1977); *Norway Hill Preservation & Protection Ass'n v. King County Council,* 87 Wn.2d 267, 272, 552 P.2d 674 (1976). Nor does the requirement that environmental costs of the proposed action be fully disclosed and evaluated preclude the consideration of other important factors, including the economic costs of denying the variance request. The Washington Clean Air Act expressly provides for evaluation of the financial impact of a variance decision. RCW 70.94.181(1)(a), (b). SEPA does not expressly articulate the need to weigh economic as well as environmental

factors. It requires that a detailed statement of environmental impact be available to and considered by the decision makers. It does not require that those evaluating a proposed action consider environmental factors *alone*. Rather, the essential factors balanced frequently are the substantiality and likelihood of environmental cost *and* economic cost.

> [The environmental impact statement] is the basis upon which the responsible agency and officials can make the balancing judgment mandated by SEPA between the benefits to be gained by the proposed "major action" and its impact upon the environment.

*Norway Hill Preservation & Protection Ass'n v. King County Council, supra* at 272–73. Having held that an EIS is required, it is not our role to balance these factors. This responsibility lies with PSAPCA.

When PSAPCA has before it an EIS which includes all information required by RCW 43.21C.030(2)(c), it may grant or deny the requested variance based upon full knowledge of the consequences. For the first time it will be able to consider all environmental and economic effects of the proposed variance, not just those related to air pollution.

We note further that the preparation of an EIS now may not take the 5 months originally estimated at the time the variance was sought. Both PSAPCA and ASARCO have had nearly 5 years to study and evaluate the environmental effects of the high–level emissions from the ASARCO plant. In fact, in oral argument before the trial court, ASARCO's counsel stated:

> as a gesture of good faith and to satisfy the public and environmentalists, ASARCO is in the process of preparing an EIS. It is in full schedule, PSAPCA agrees, and we are working with PSAPCA.

The information contained in ASARCO's EIS should considerably lessen the amount of time necessary for PSAPCA to prepare the formal EIS.

The trial court is reversed on this issue.

## ENTITLEMENT TO ATTORNEYS' FEES

Appellants have requested an award of attorneys' fees. They concede that fees will not be awarded in the absence of a contract, statute or recognized ground of equity. *Seattle School Dist. 1 v. State,* 90 Wn.2d 476, 540, 585 P.2d 71 (1978). They assert, however, that this court has recognized several exceptions to the general rule.

First, they contend a prevailing party may recover attorneys' fees under the "common fund" theory. Their claim fails, however, for lack of any identifiable "common fund" preserved by the litigation.

Second, appellants assert a claim for attorneys' fees based upon this court's alleged equitable and supervisory powers. We are not informed why or under what applicable facts we should exercise these alleged powers to grant attorneys' fees. Lacking this essential information, we will not grant the request.

Third, appellants argue that a prevailing party is entitled to an award of attorneys' fees if constitutional principles are successfully defended. However, we are not told what constitutional principles have been successfully defended, what patently unconstitutional administrative and/or legislative actions were involved, or what expenditure of public funds has been successfully challenged thereunder. Consequently, we are aware of no authority to award attorneys' fees under the asserted theory. *See PUD 1 v. Kottsick,* 86 Wn.2d 388, 391, 545 P.2d 1 (1976); *Weiss v. Bruno,* 83 Wn.2d 911, 914, 523 P.2d 915 (1974).

Fourth, it is contended a prevailing party may be awarded attorneys' fees if their action has conferred a substantial benefit on an ascertainable class. However, the record fails to disclose the membership of the asserted class, what benefit it derived, or the extent thereof. Further, the court is not shown to have any identifiable "estate" or "fund" under its control upon which attorneys' fees may be imposed. *Seattle School Dist. 1 v. State, supra* at 541–42. Consequently, we are unable to convert this vague claim into an award of attorneys' fees.

Fifth, it is said that a prevailing party is entitled to attorneys' fees if the conduct of the losing party constitutes bad faith or wantonness, citing *State ex rel. Macri v. Bremerton,* 8 Wn.2d 93, 113–14, 111 P.2d 612 (1941). *Macri* does not support their claim. Probably the nearest case in point is *Hsu Ying Li v. Tang,* 87 Wn.2d 796, 797–98, 557 P.2d 342 (1976). However, *Hsu*'s award of attorneys' fees was only superficially based on proof of constructive fraud (a stronger claim than that made here). The actual award stemmed from the prevailing party's having preserved partnership assets, *i.e.,* an identifiable fund. Thus, even *Hsu* is not in point. *See Seattle School Dist. 1 v. State, supra* at 543. Assuming *Macri* supports appellants' assertion, however, the record is not sufficient to establish wantonness and bad faith on the part of the losing party. Without question the case has been hard fought with considerable legal in–fighting and delay by ASARCO. Nevertheless, we are not prepared to say, without more evidence, that this alone rises to the stature claimed by appellants.

If appellants are entitled to recover attorneys' fees under some theory, whether set forth above or otherwise, it is not self–evident. The request for an award of fees is denied.

## SUMMARY

Contrary to the trial court's holding, the PCHB has jurisdiction to hear and decide appeals from PSAPCA decisions granting variances from its rules and regulations. The trial court's holding that the PCHB lacked jurisdiction to grant appellants' motion for summary judgment by means of PCHB order No. 997 also is in error. Further, the trial court erred by vacating PCHB order No. 997 which revised and remanded PSAPCA's resolution 359 for further proceedings pursuant to SEPA before acting on ASARCO's application for a variance. Finally, the trial court is reversed, PCHB's order No. 997 is reinstated, PSAPCA's resolution No. 359 is vacated, and the matter remanded to PSAPCA for full compliance with PCHB order No. 997

including the preparation of a proper EIS pursuant to SEPA.

UTTER, C.J., and ROSELLINI, WRIGHT, BRACHTENBACH, HOROWITZ, DOLLIVER, and WILLIAMS, JJ., concur.

HICKS, J. (concurring in part and dissenting in part)— Contrary to the majority, I would affirm the trial court. Consequently, I concur with the majority only in that portion of the opinion captioned "Entitlement to Attorneys' Fees"; as to the balance of the opinion, I dissent.

Reconsideration denied December 12, 1979.