[No. 9314–0–III.   Division Three.   April 13, 1989.]

WEST 514, INC., ET AL, *Appellants,* v. THE COUNTY OF
SPOKANE, ET AL, *Respondents.*

*Randall Gaylord, William Symmes,* and *Witherspoon, Kelley, Davenport & Toole,* for appellants.

*Donald C. Brockett, Prosecuting Attorney,* and *James Emacio, Chief Civil Deputy; Stanley Schultz, Winston & Cashatt, Gerald Neal,* and *Lukins & Annis,* for respondents.

*Wells B. McCurdy,* pro se.

THOMPSON, C.J.—West 514, Inc., Antone and Sundena Plese, and Darlene Compton[1] (hereafter referred to as West 514) appeal a superior court judgment on writ of certiorari. The judgment affirmed the decision of the Spokane County Board of Commissioners to approve defendant Cafaro Company's site development plan for a proposed retail shopping mall in the Liberty Lake area.[2] In evaluating the effect of the mall on the environment, the Board utilized a 1978 environmental impact statement (EIS) prepared for a different proposal on the same site. The primary issue is whether the Board should have required a supplemental EIS under WAC 197–11–600, promulgated pursuant to RCW 43.21C, the State Environmental Protection Act of 1971 (SEPA). That regulation provides:

(4) Existing documents may be used for a proposal by employing one or more of the following methods:

---

[1]West 514, Inc., is a corporation doing business as Flaherty's Restaurant in downtown Spokane. Darlene Compton is a co–owner of the property West 514, Inc., leases for its business. Antone and Sundena Plese are property owners in and residents of Liberty Lake, Washington.

[2]The remaining defendant, Liberty Lake Investments, Inc., holds a deed of trust on the property which is the subject of the proposal.

. . .

(d) Preparation of a SEIS [supplemental EIS] if there are:

(i) Substantial changes so that the proposal is likely to have significant adverse environmental impacts; or

(ii) New information indicating a proposal's probable significant adverse environmental impacts.

We affirm.

In 1978, the sponsor of a project entitled "The Highlands" obtained a rezone of the subject property for restricted industrial and commercial use. The Highlands proposal involved 800 acres and included plans for a 700–acre residential development, a 29–acre community shopping center with a building area of 128,000 square feet, a 20–acre office park, and an 80–acre business park. In 1981, the sponsor submitted a request for a boundary line adjustment. The commercial zone was increased, but, as a condition to the change, the sponsor was required to submit site development plans for public hearing prior to the issuance of a building permit. For reasons not apparent in the record, the Highlands project was not pursued.

In 1986, Cafaro Company submitted its site development plan for approval. The proposed plan is for a regional shopping center covering 97 acres with a building area in excess of 1 million square feet and parking for 4,550 vehicles. The plans include widening Liberty Lake Road, constructing a new 4–lane road along the southern perimeter of the property, and improving the Harvard Road interchange and the Greenacres interchange to Interstate 90.

On December 23, 1986, the Spokane County Planning Department, in considering the Cafaro site development plan, adopted both the draft EIS and the final EIS prepared in 1978 for the Highlands project and also entered a mitigated determination of nonsignificance (MDNS). The MDNS stated:

The lead agency [Spokane County Planning Department] for this proposal has determined that it does not

have a probable significant adverse impact on the environment if mitigated as stipulated below. An Environmental Impact Statement (EIS) is *not* required under RCW 43.21C.030(2)(c). This decision was made after review of a completed environmental checklist and other information on file with the lead agency. . . .

There are four areas of concern in the development of the Liberty Lake site. . . .

1) A background and continued air quality monitoring program. . . .

2) A detailed traffic and circulation plan. . . .

3) A drainage plan dealing with '208' design concepts on–site and the off–site drainage disposal for flood waters as identified by the 100–year Flood Hazard Area. . . . ['208' refers to the report of the Spokane County Water Quality Management Program on its investigation of the Spokane–Rathdrum Prairie Aquifer.]

4) Development in substantial conformance with the submitted site plan except as may be modified by the above studies. . . .

At a public hearing on January 8, 1987, the Spokane County Hearing Examiner concurred with the Planning Department's decision and approved the site development plan.

West 514 appealed this decision to the Spokane County Board of Commissioners which held a de novo hearing on February 19, 1987. At the hearing, West 514 presented the testimony of Dr. Larry Esvelt of Esvelt Environmental Engineering concerning the impact of the proposed mall on water quality. He pointed out that while the 1978 EIS acknowledged that the closed Greenacres Landfill, located immediately southwest of the project, was a "potential aquifer water quality factor", since that time the landfill has been confirmed as a major source of contaminants and placed on the National Priorities List of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (Superfund).

Dr. Esvelt expressed two concerns about the effect of runoff from the mall on water quality. First, "the injection of water at this site is going to increase . . . the water flow

in ground water through the area we know is already contaminated by the Greenacres Landfill." Dr. Esvelt was referring to the fact that at least one water source downgradient from the landfill (the Jeffers well) had been identified as containing leachate[3] from the landfill. He testified: "My feeling is that this project could affect . . . methods for cleanup [of the landfill] and we don't know what they're going to be, but it could impact them by spreading the contaminant beyond where they are now . . ."

Second, there are nutrients and toxic metals present in storm water runoff which also pose a threat to the aquifer. The proposal calls for the runoff to be filtered through a grass percolation area. According to Dr. Esvelt, the efficiency of grass percolation areas has not been documented. He also submitted a written report to the Board in which he stated that "[i]nstallation of stormwater conveyance to another location, such as the Spokane River, should be considered . . ."

In response, Michael Kennedy, consulting engineer to the Cafaro Company, testified that the project met the drainage treatment requirements of Spokane County's Water Quality Management Plan. He stated that any leachate from the landfill would not flow in the direction of the grass percolation area.

West 514 also presented the testimony of Greg Easton, a consulting economist. He reviewed the experience of Tacoma, Everett, Olympia and Seattle and concluded that regional shopping malls had caused a decline in retail sales in the central business districts in those cities. Further, "the loss of retail sales has been accompanied in some instances . . . by, losses of, major office tenants and accompanied in many cases by deterioration of the physical environment". In response to questioning, he admitted Spokane's downtown area was more viable than those of Tacoma, etc. However, he also predicted that the region could not in the near future generate enough retail dollars

---

[3]Liquid that percolates through soil or other medium.

to support both the new mall and the existing retail shopping sites. Paul Richley of the Cafaro Company countered that the mall would draw shoppers from a wider area and, therefore, the share of the "pie" would not necessarily be reduced.

Witnesses for the Cafaro Company compared other aspects of the current proposal with the 1978 project. Ron Kirkwood, an engineer and vice–president of development for the Cafaro Company, compared the road systems of the two projects, and stated they were very similar but that Cafaro's proposal was a refinement of the first plan and would eliminate traffic stalling. Another engineer, Glen O'Dell, compared the air quality impacts of the two projects. He testified that presently carbon monoxide levels at the site average 2.5 parts per million cubic feet of air. The 1978 project would have raised that average to 10 to 13 parts per million, but his computer analysis of the impact of the present proposal predicts a level of 7 to 8 parts per million. Federal and state standards call for no more than 9 parts per million.

The Board's findings may be summarized as follows:

1. The Greenacres Landfill was adequately discussed in the 1978 EIS. With respect to Dr. Esvelt's comments that it is difficult to predict what will happen at the landfill as a result of its placement on the federal Superfund toxic waste cleanup list, the Board noted that placement on the list requires responsible parties to take appropriate action in light of surrounding land uses, including the proposal. The Board also cited Engineer Kennedy's testimony that drainage from the landfill will not be affected by the proposed storm water drainage basin for the project.

2. Economic or socioeconomic consequences of a shopping center cannot be the basis for the requirement of an EIS.

3. Allegations of toxic substances in storm water runoff and allegations of the limited success of "208 storm water methods" are not "new information" under WAC 179–11–600 so as to require a supplemental EIS. The new project is

subject to 208 water quality management provisions which requires more stringent standards than the 1978 project.

4. The impacts due to road construction and air quality are less than those predicted in the prior EIS. The condition of approval requiring air quality monitoring and modeling is a mitigating condition which when met will confirm that the project will not have a significant adverse environmental impact.

West 514 appealed the Board's decision, assigning error to the above findings. On April 19, 1988, the Superior Court entered a judgment which affirmed the decision of the Board of Commissioners approving Cafaro's site development plan.

The sole issue is whether the Board's decision is clearly erroneous. *Asarco Inc. v. Air Quality Coalition*, 92 Wn.2d 685, 700, 601 P.2d 501 (1979); *Norway Hill Preserv. & Protec. Ass'n v. King Cy. Coun.*, 87 Wn.2d 267, 275, 552 P.2d 674 (1976). Under this standard, agency action may be reversed when the reviewing court is firmly convinced in light of the record and the public policy contained in RCW 43.21C.010[4] that a mistake has been committed.[5] *Nisqually*

---

[4]RCW 43.21C.010 states:

"The purposes of this chapter are: (1) to declare a state policy which will encourage productive and enjoyable harmony between man and his environment; (2) to promote efforts which will prevent or eliminate damage to the environment and biosphere; (3) and stimulate the health and welfare of man; and (4) to enrich the understanding of the ecological systems and natural resources important to the state and nation."

[5]In applying the standard here, two subissues are presented concerning what constitutes the record. First, West 514 assigns error to that portion of the Superior Court's memorandum opinion in which the judge stated that the testimony of the mall opponents fell short of showing to a scientific probability or likelihood that the proposed project would have more than a moderate environmental impact. It argues that the Superior Court held them to a more onerous standard than that of RCW 43.21C.031, which requires an environmental impact statement for all proposals having a *probable, significant, adverse environmental impact*. The language used by the Superior Court is irrelevant to this court's review. It is clear that this court applies the "clearly erroneous" standard *directly* to the challenged *administrative* decision. *Nisqually Delta Ass'n v. DuPont*, 103 Wn.2d 720, 696 P.2d 1222 (1985). To the extent that West 514's challenge to the "scientific

*Delta Ass'n v. DuPont,* 103 Wn.2d 720, 725–26, 696 P.2d 1222 (1985); *Asarco Inc. v. Air Quality Coalition, supra* at 700. In such reviews, the court recognizes and defers to the expertise of the administrative agency. *Nisqually;* RCW 43.21C.090.

First, West 514 contends that Dr. Esvelt's testimony about the impact of the mall on water quality constitutes "new information" under WAC 197–11–600 and, therefore, a supplemental EIS is required.

WAC 197–11–600(4)(d)(ii) states a supplemental EIS should be prepared if there is "[n]ew information indicating a proposal's *probable significant* adverse environmental impacts". (Italics ours.) While "probable" is used to distinguish likely impacts from those that are remote or speculative, it "is not meant as a strict statistical probability test". WAC 197–11–782. "Significant" involves context and intensity. "An impact may be significant if its chance of occurrence is not great, but the resulting environmental impact would be severe if it occurred." WAC 197–11–794(2).

█ In *Barrie v. Kitsap Cy. Boundary Review Bd.,* 97 Wn.2d 232, 235, 643 P.2d 433 (1982), the court noted that passage of time alone is not "significant new information", and the lead agency must determine whether the new information is significant. It quoted the discussion of what is significant contained in *National Indian Youth Coun. v. Andrus,* 501 F. Supp. 649, 663–64 (D.N.M. 1980), *aff'd sub nom. National Indian Youth Coun. v. Watt,* 664 F.2d 220 (10th Cir. 1981):

---

probability" language of the Superior Court also involves a challenge to the Board of Commissioners' finding the proposal had no significant adverse environmental impact, it will be discussed below.

Second, West 514 contends the record should include four documents which Dr. Esvelt referenced in his report to the Board. While the Board received a copy of Dr. Esvelt's report, they did not receive copies of the four documents. Dr. Esvelt's report merely states that it is based upon those four documents. We agree with the Superior Court that the documents were not before the Board of Commissioners, and, thus, cannot be considered.

> Any project . . . will, undoubtedly, generate "information" as it progresses. . . . [I]n order for "new circumstances or information" to attain the status of "significant" these must reach that level where, reasonably, it becomes necessary to focus attention once more upon the environmental aspects of a project. . . . An otherwise unguarded reading of this subpart could unleash a procedural plague . . .

*Barrie,* at 235–36. Further, "every remote and speculative consequence of an action [need not] be included in the EIS." *Cheney v. Mountlake Terrace,* 87 Wn.2d 338, 344, 552 P.2d 184 (1976).

Here, Dr. Esvelt raised concerns about the proximity of the Greenacres Landfill and predicted that runoff from the mall "could" affect methods for cleanup of the landfill. On the other hand, he admitted that runoff from the mall and leachate from the landfill would remain completely separate until reaching the aquifer.

This testimony does not constitute significant new information. The Greenacres Landfill and its potential for contaminating sources of drinking water existed in 1978. In the prior EIS, W.R. Dobratz of the county engineering department commented that "[t]he old landfill area should not be used for subsurface wastewater or storm water disposal . . . because of possible leachate problems". The subsequent identification of contaminants in the Jeffers well and the placement of the landfill on the Superfund cleanup list are developments that could be expected to occur with the passage of time. Finally, Dr. Esvelt's opinion that runoff from the mall "could" affect methods of cleanup of the landfill is too speculative to require a supplemental EIS.

Dr. Esvelt also expressed doubts concerning the effectiveness of grass percolation areas as a means of disposing of storm water runoff. But again, the 1978 EIS, in the response to comment 13, recognized that runoff water contains contaminants and considered the problem of effectively removing those contaminants. The Highlands project proposed to inject runoff directly into dry wells. Dr. Esvelt

did not suggest that the grass percolation areas of the current proposal posed a greater impact.

Accordingly, we affirm the Board's determination that the 1978 EIS was adequate for reviewing the impact of the proposed mall on water quality.

Second, West 514 argues that Mr. Easton's testimony about the effect of regional malls on central business districts is evidence that the proposed mall is a "substantial change" "likely to have significant adverse . . . impacts" on the environment of downtown Spokane. Under WAC 197–11–600(4)(d)(i), such a change, if proven, requires preparation of a supplemental EIS. *See also Save a Neighborhood Env't v. Seattle,* 101 Wn.2d 280, 284, 676 P.2d 1006 (1984); *SEAPC v. Cammack II Orchards,* 49 Wn. App. 609, 613, 744 P.2d 1101 (1987).

Much of Mr. Easton's testimony is general in nature. He gave Olympia, Everett and Tacoma as examples of cities in which central business districts had suffered physical deterioration as the result of competition from regional malls. Yet he conceded that the experience of those cities might not be relevant to Spokane because Spokane has a more viable downtown.

There is no doubt that a large mall in the Liberty Lake area will compete economically with downtown Spokane as well as other area retail centers. But economic competition, in and of itself, is not an environmental effect and need not be discussed in an EIS. WAC 197–11–448(3). What is missing here is evidence that the proposed mall is likely to have a significant adverse impact on the *physical* environment of downtown Spokane. While loss of retail sales and resulting blight is a possibility, West 514 did not establish the probability or likelihood of this occurring in Spokane. The Board of County Commissioners was entitled to disregard Mr. Easton's general predictions as not relevant to the circumstances presented. Thus, we affirm the Board's determination that a supplemental EIS is not required on this issue. In so holding, we recognize that if the *probable* effect of competition is downtown blight such

that the built environment is affected, then discussion of that effect in an EIS is called for. RCW 43.21C.030(2); WAC 197–11–444(2).[6]

Third, West 514 asserts it was error for the Spokane County Planning Department to issue the MDNS. It describes the MDNS as conditioned on future environmental studies which in and of themselves had no mitigating effect. In West 514's view, this procedure allowed the County to make a determination of nonsignificance before the full impact of the mall was understood.

The Washington Administrative Code describes when an MDNS is appropriate:

> The purpose of this section is to allow clarifications or changes to a proposal prior to making the threshold determination.
> (1) In making threshold determinations, an agency may consider mitigation measures that the agency or applicant will implement.
>
> . . .
>
> (3) . . . [I]f the lead agency specifies mitigation measures on an applicant's proposal that would allow it to issue a DNS, and the proposal is clarified, changed, or *conditioned* to include those measures, the lead agency shall issue a DNS.

(Italics ours.) WAC 197–11–350. When a governmental agency makes a negative threshold determination, it must show it considered environmental factors "in a manner sufficient to amount to prima facie compliance with the procedural requirements of SEPA.'" *Sisley v. San Juan Cy.*, 89

---

[6]Kenneth S. Weiner, special counsel to the Commission on Environmental Quality, said in his section–by–section analysis of the 1983 amendments to SEPA:
> Traditional areas of concern which would clearly be covered by this section [RCW 43.21C.110(f)] include . . . the problems of blight of downtown and urban areas which would be caused by proposed actions.

Weiner, *Section–By–Section Summary of S.S.B. 3006*, at 195, in R. Settle, *Washington Land Use and Environmental Law and Practice* (1983). *See also* Rodgers, *The Washington Environmental Policy Act*, 60 Wash. L. Rev. 33, 51 (1984) (neither the Legislature nor the WACs eliminate entirely the obligation to consider and discuss socioeconomic effects); Washington State Bar Ass'n, *Major Changes Under the New SEPA Rules–1984*, Second Environmental and Land Use Law Section Mid–Year Meeting and Seminars 3–1, at 3–23 (1984).

Wn.2d 78, 84, 569 P.2d 712 (1977) (quoting *Juanita Bay Vly. Comm'ty Ass'n v. Kirkland,* 9 Wn. App. 59, 73, 510 P.2d 1140 (1973)).

Here, the MDNS was issued only after the Planning Department adopted the pertinent parts of the 1978 EIS, reviewed the environmental checklist submitted by Cafaro, and conditioned approval on development in conformance with the site plan "except as may be modified by the . . . studies" specified in the MDNS. In *Murden Cove Preserv. Ass'n v. Kitsap Cy.,* 41 Wn. App. 515, 525, 704 P.2d 1242 (1985), the court upheld approval of a project conditioned on completion of mitigation measures. *See also Hayden v. Port Townsend,* 93 Wn.2d 870, 880–81, 613 P.2d 1164 (1980), *overruled on other grounds in Save a Neighborhood Env't v. Seattle, supra* at 286 n.1. We agree with the Board that the Planning Department adequately considered environmental factors under SEPA before it issued the MDNS.

The Board's action in approving Cafaro's site development plan is affirmed.

GREEN and MUNSON, JJ., concur.

Review denied at 113 Wn.2d 1005 (1989).