[No. 13455-5-III. Division Three. December 27, 1994.]

INDIAN TRAIL PROPERTY OWNER'S ASSOCIATION, *Appellant*, v. THE CITY OF SPOKANE, ET AL, *Defendants*, INDIAN TRAIL PARTNERSHIP, ET AL, *Respondents*.

*Stephen K. Eugster*, for appellant.

*Stanley R. Schultz, Spencer A. Stromberg*, and *Witherspoon, Kelley, Davenport & Toole, P.S.*, for respondents.

THOMPSON, C.J. — The Indian Trail Property Owner's Association (ITPOA) appeals a superior court judgment which affirmed a decision by the hearing examiner for the City of Spokane. That decision involved three appeals by ITPOA, all relating to the proposed expansion of the Indian Trail Shopping Center. We affirm.

## FACTS

The Indian Trail Shopping Center is located on Indian Trail Road north of Francis Avenue in the Spokane city limits. It is situated on approximately 4 acres of land and is owned and operated by the Indian Trail Syndicate Limited Partnership (Partnership). The site is zoned B1, the "Local Business Zone". Spokane, Wash., Municipal Code (SMC) 11.19.130-.133 (1991).

On or about July 17, 1991, the Partnership applied for building permits to reconstruct and expand the shopping center. The existing shopping center contained a 16,500-square-foot grocery store, retail shops, dental clinic and service station. A portion of the site was undeveloped. The Partnership wanted to replace the grocery with a 47,000-square-foot store, construct a 3,820-square-foot building for retail space, relocate the dental clinic and expand and relocate the service station to other parts of the site. The proposed 47,000-square-foot grocery store would contain a pharmacy, floral shop, video rental and delicatessen. An environmental checklist required by the State Environmental Policy Act (SEPA), RCW 43.21C, was filed.

Spokane's director of building services, the "responsible official" under SEPA,[1] reviewed the Partnership's environ-

---

[1] A "responsible official" is the person or entity designated by an agency to carry out the agency's SEPA duties and functions when it is the lead agency under SEPA guidelines. WAC 197-11-788; WAC 197-11-910.

mental checklist and issued a mitigated determination of nonsignificance (MDNS). The checklist and MDNS were circulated to the public and public agencies. As a result of comments received, the MDNS was withdrawn and the Partnership asked to provide supplemental information. After receipt and review of the supplemental information, a revised MDNS was issued. ITPOA appealed issuance of the MDNS to the hearing examiner. SMC 4.21.100.

The building services director also issued a determination of nonsignificance (DNS) regarding underground fuel storage tanks to be installed in the reconstructed center. ITPOA appealed issuance of the DNS to the hearing examiner. SMC 4.21.100.

Shortly after applying for building permits, the Partnership asked the city zoning administrator to determine whether its project would be permitted in the B1 zone. The zoning administrator determined it would. The determination was made after the first MDNS had been withdrawn and before a new threshold determination had been made. ITPOA appealed to the hearing examiner. SMC 4.21.100.

By stipulation, all appeals were heard on April 29 and May 13, 1992. The zoning interpretation was upheld. The MDNS for the entire project was approved in part and remanded in part. Building permits were subsequently issued.

ITPOA requested superior court review of the hearing examiner's decision by writ of certiorari. The hearing examiner's decision was upheld. ITPOA timely filed this appeal.

### Zoning Interpretation

Contentions. ITPOA contends the proposed 47,000-square-foot "superstore" is prohibited in the B1 zone which only allows "small retail sales and services stores and shops . . .". SMC 11.19.130(B). According to ITPOA, the superstore is more like a department store and the project more like a shopping center, and both are permitted only in B2 and B3 zones. SMC 11.19.0353, .140, .154. ITPOA contends the superstore does not fall within the purpose of the B1 zone which is "to provide limited shopping facilities in residential neighborhoods" (SMC 11.19.040(A)(9)) because it is not

intended to serve the neighborhood, but to draw customers from outside of it. SMC 11.19.040. Further, it would not contribute to the quality of the surrounding residential area. SMC 11.19.130.

The Partnership contends its project is permitted in the B1 zone because it complies with all specific, objective zoning regulations, including the permitted use regulations (SMC 11.19.131, .133) and the height, bulk, setback, landscaping, screening, parking, and loading regulations (SMC 11.19.460.490). According to the Partnership, ITPOA focuses not on the objective standards of the zoning ordinance, but on generalized, subjective descriptions of B1 zones. SMC 11.19.130. It notes that trade area restrictions were eliminated for B1 zones and any reasonable comparison between B1 and B2 zones indicates that the square footage of business uses permitted in B1 zones is "small" compared to permitted business uses in B2 zones.

 Standard of Review. Under a writ of certiorari, appellate court review is based on the record of the administrative tribunal. *Concerned Land Owners v. King Cy.*, 64 Wn. App. 768, 827 P.2d 1017, *review denied*, 119 Wn.2d 1008 (1992). Factual review is limited to a determination of whether the administrative action was arbitrary and capricious, the same as determining the competency and sufficiency of evidence. *State ex rel. Lige & Wm. B. Dickson Co. v. County of Pierce*, 65 Wn. App. 614, 829 P.2d 217, *review denied*, 120 Wn.2d 1008 (1992); *Concerned Land Owners v. King Cy., supra. See generally* RCW 7.16.120. On issues of law, the error of law standard is applied. *Franklin Cy. Sheriff's Office v. Sellers*, 97 Wn.2d 317, 324, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106 (1983). The question of whether a use is permitted under a zoning ordinance is determined as a matter of law. *Mercer Island v. Kaltenbach*, 60 Wn.2d 105, 107, 371 P.2d 1009 (1962).

Zoning Ordinance. Spokane's zoning ordinance follows the "traditional zoning form of separate zones in which specific types of structures, uses of land and activities, all grouped on the basis of similarity of impacts upon surrounding prop-

erties, are permitted." SMC 11.19.010(B)(1). Business zones are divided into three categories: B1, "Local Business Zone"; B2, "Community Business Zone"; and B3, "Central Business Zone". SMC 11.19.130, .140, .150. The purposes and functions of each zone are specified in the ordinance, as are site development requirements, permitted land uses, and size limitations.

The stated purpose of the B1 zone is "to provide in a residential neighborhood those day-to-day goods and services needed by the residents". SMC 11.19.130. The stated purpose of the B2 zone is "to provide at a location convenient to arterial streets a shopping center for several neighborhoods within an approximate one and one-half mile radius". SMC 11.19.140. The B3 zone is intended to accommodate a variety of goods, services, and business uses in the city center to serve the entire metropolitan area. SMC 11.19.150.

In 1986, the zoning ordinance was amended to delete the half-mile service area limitation of B1 zones. However, the service area limitation of B2 zones was not deleted, nor was the comprehensive plan amended to delete service area guidelines for B1 zones. The zoning ordinance thus contains a $1^1/_2$-mile service area restriction in B2 zones with no such restriction in B1 zones. The comprehensive plan contains a 3-mile service area guideline for B1 zones.

As to B1 land uses and sizes, the ordinance states:

A. . . . Normally a B1 zone will collect such neighborhood shopping facilities in a central location at street intersections of from one to five acres in size, of usable land, rather than having business uses scattered throughout the neighborhood or in ribbon patterns along streets.

B. The primary uses are small retail sales and services stores and shops of a character which contributes to, rather than detracts from, the quality of residential use.

SMC 11.19.130. Uses specifically permitted in B1 zones include retail bakery; drugstore; hardware; variety store; florist; grocery; produce; meat market; office, business or professional; restaurant (with enumerated limitations); and service station (with enumerated limitations). SMC 11.19.131. A car wash is allowed by special permit. SMC 11.19.132.

As to uses and sizes in B2 zones, the ordinance states:

> A. . . . Normally a B2 zone will collect a greater variety of retail, service and office uses than permitted in the B1 zone in a central business island of from ten to thirty acres in size in a trade or business area, rather than through overdeveloped local business zones or in ribbon patterns along arterials.

Any use permitted in B1 zones is permitted in B2 zones. SMC 11.19.140. In addition, permitted uses in B2 zones include a car wash and a "[d]epartment store or any element of a department store, such as carpet and floor covering, furniture and antiques, including incidental repair and upholstery, leather goods, and office supplies sales". SMC 11.19.141(L).

The site development standards for each zone include setback requirements as well as requirements governing parking spaces, landscaping, screening, building height, and minimum lot widths and areas. SMC 11.19.460.490.

Comprehensive Plan. Spokane's land use plan, a component of the comprehensive plan, describes B1 neighborhood shopping districts as follows:

> The neighborhood shopping district usually provides for the sale of convenience goods (food, drug, and sundries) and personal services which meet the daily needs of an immediate neighborhood trade area. The neighborhood shopping district is not shown on the Land Use Plan Map, but rather its location is governed by the commercial policies. It may be a planned shopping facility or an aggregation of independent business units, normally with an independent grocery or supermarket as the principal tenant. A neighborhood shopping district typically has a gross leasable area of about 50,000 square feet, but may range from approximately 30,000 to 100,000 square feet. It typically occupies a site of 3 to 5 acres, usually serving a trade area population within a six minute drive.[2] Certain types of business might locate in a neighborhood business district and serve a larger trade area, but should be of the type that would not adversely affect the neighborhood district primary function.

Comprehensive Plan, at 4-7 (*see generally* SMC 11.20).

---

[2] In the determination letter, the zoning administrator noted: "Typically, arterial streets have a speed limit of 30 miles per hour. A six minute drive at this speed would result in a 3 mile service radius . . .".

B2 community shopping districts are described in the comprehensive plan as typically having a gross leasable area of about 150,000 square feet, but may range from 100,000 to 300,000 square feet.

Zoning Administrator's Determination. The zoning administrator determined the Partnership's proposal met the height, bulk, setback, landscaping, parking and loading requirements of the B1 zone and the proposed uses were within those allowed in B1 zones. He also found the proposed project was within the comprehensive plan's gross leasable space and site area guidelines for neighborhood shopping districts. He concluded the service area guidelines of the comprehensive plan did not apply to the proposal because B1 service area restrictions were deleted from the zoning ordinance in 1986.

Hearing Examiner's Decision. The hearing examiner affirmed the decision of the zoning administrator. He determined that SMC 11.19.130 was a "purpose clause" which was too subjective to be applied. The "regulatory clauses", SMC 11.19.131, which governed specific uses, and SMC 11.19.460.490, which established site development requirements, contained objective standards which the proposal met. According to the hearing examiner:

> To adopt [ITPOA's] reasoning would be to subject every property developer who met all the regulatory criteria to two additional tests, both of which are totally subjective in nature.
>
> The first test would be the meaning of the word "small." . . .
>
> The second . . . would be that the project must be one which contributed to and not detracted from the residential area.

■ Construing the Ordinance. A zoning ordinance does not have to meet impossible standards of specificity, but it must set forth uniform guidelines so that its interpretation is not left solely to the discretion of administrative bodies or officials. *See Burien Bark Supply v. King Cy.*, 106 Wn.2d 868, 725 P.2d 994 (1986); *Anderson v. Issaquah*, 70 Wn. App. 64, 79, 851 P.2d 744 (1993).

■ Although SMC 11.19.130 requires that primary uses in B1 zones consist of "small" retail stores and shops, the term "small" is given meaning only by reference to guide-

lines in the ordinance governing "usable land" areas and guidelines in the comprehensive plan governing "gross leasable space".[3] The ordinance refers to B1 shopping facilities as encompassing up to 5 acres of usable land and B2 facilities encompassing 10 to 30 acres. The comprehensive plan envisions B1 shopping districts as having gross leasable areas ranging from 30,000 to 100,000 square feet, while B2 shopping districts range from 100,000 to 300,000 square feet. Since the Partnership's proposal contemplated 53,270 square feet of gross leasable space on 4 acres of land, it was well within B1 standards. As a shopping facility, it would be "small" when compared to facilities permitted in B2 zones. A zoning ordinance is to be construed as a whole to ascertain the purpose and effect of a single section. *Dando v. King Cy.*, 75 Wn.2d 598, 603, 452 P.2d 955 (1969).

■ The zoning ordinance also refers to a B1 zone as a collection of "neighborhood shopping facilities in a central location" (SMC 11.19.130) which provides "limited shopping facilities in residential neighborhoods" (SMC 11.19.040(A)(9)). The comprehensive plan refers to a B1 zone as "a planned shopping facility" which provides "for the sale of convenience goods (food, drug, and sundries) and personal services . . .". Neither the ordinance nor comprehensive plan requires that uses permitted in B1 zones be housed in separate buildings. While a limitation on the service area might restrict the size and character of an individual store, B1 service area restrictions were eliminated from the ordinance when it was amended in 1986. As the zoning administrator noted in his interpretative letter, with that amendment the 3-mile restriction in the comprehensive plan became ineffective. *See Norco Constr., Inc. v. King Cy.*, 97 Wn.2d 680, 649 P.2d 103 (1982) (when a conflict arises between a comprehensive plan and zoning regulations, the plan is subordinate to the regulations).

Standing alone, the requirement that stores and shops in B1 zones be of a size and character which benefits but does

---

[3]Spokane's zoning ordinance contains only one specific square footage requirement for an individual store, a 4,000-square-foot limitation on antique stores. SMC 11.19.131(B).

not detract from the neighborhood also fails to provide sufficient guidance for determining whether a proposed use is permitted. It must be construed in conjunction with SMC 11.19.131 which enumerates the uses specifically permitted in B1 zones and with the site development requirements of SMC 11.19.460.490. The proposed uses fall within those specifically permitted (retail bakery, drugs, hardware, florist, grocery, produce, meat market, service station) and meet or exceed all site development requirements. We disagree with ITPOA's contention that the superstore is a department store. The zoning ordinance refers to the elements of a department store as including "carpet and floor covering, furniture and antiques, including incidental repair and upholstery, leather goods, and office supplies sales". SMC 11.19.141.

■ As the hearing examiner concluded, a zoning decision must relate to legal requirements. While community sentiment can be instrumental in the development of those legal requirements through the planning process, it alone cannot form the basis of a zoning decision. *See Maranatha Mining, Inc. v. Pierce Cy.*, 59 Wn. App. 795, 801 P.2d 985 (1990); *Kenart & Assocs. v. Skagit Cy.*, 37 Wn. App. 295, 680 P.2d 439, *review denied*, 101 Wn.2d 1021 (1984).

The administrative action was not arbitrary and capricious. The Partnership's proposal involved uses permitted in the B1 zone.

### SEPA Review and Zoning Determination

Contentions. ITPOA contends the Partnership's request for a zoning determination triggered the SEPA process because it was tied to a specific proposal, the determination constituted a major action, and the same factors considered under SEPA had to be considered under the zoning ordinance.

The Partnership contends SMC 11.19.130(B) does not require environmental review independent of SEPA. Further, since its request was only a preliminary determination, SEPA was not triggered. According to the Partnership, preliminary determinations are necessary to allow proposals to become sufficiently definite for SEPA review to be meaningful. At the

time of its request, there was no contested case, a rezone was not being sought, nor was the Partnership asking for a conditional use or other permit. It was simply a request as to what would probably happen if an application were made for a building permit.

■ Ordinance Did Not Incorporate SEPA. For purposes of determining whether a use is permissible in a B1 zone, the factors considered under SEPA are not incorporated by reference into SMC 11.19.130(B). Indeed, the zoning code predates SEPA. A court will not read additional language into a statute unless it is required to make it rational. *State v. Edwards*, 104 Wn.2d 63, 68, 701 P.2d 508 (1985). Nevertheless, major action could not be taken on the Partnership's proposal without consideration of SEPA.

SEPA Review Part of Building Permit Processing. The SEPA process is triggered by a "major action". WAC 197-11-764 describes a major action as one "likely to have significant adverse environmental impacts". "Major" does not have a meaning independent of "significant". WAC 197-11-764. An action is significant if there is "a reasonable likelihood of more than a moderate adverse impact on environmental quality". WAC 197-11-794.

■ Standing alone, a request for zoning interpretation does not constitute a major action. However, when such request is coupled with an application for a building permit, the SEPA process must be commenced. WAC 197-11-055(1) (the SEPA process must be integrated with agency activities at the earliest possible time to "ensure that planning and decisions reflect environmental values . . ." and "avoid delays later in the process . . .").

While we agree with the Partnership and the hearing examiner that SEPA regulations recognize that preliminary decisions may be needed before an action is sufficiently definite to allow meaningful SEPA analysis, WAC 197-11-055(2)(a)(ii), the Partnership's request for zoning interpretation was made on August 16, 1991, *after* it submitted its application for building permits. At this time, the principal features of the proposal and its environmental impacts could

be reasonably identified. WAC 197-11-055(2). Appropriately, the SEPA process was already underway in connection with the agency's action on the building permits.

While it is clear the Partnership's proposal was sufficiently definite to allow for meaningful SEPA review before the zoning determination was made, the zoning determination itself was not dependent on the outcome under SEPA.

### SEPA, MDNS AND MITIGATION

Contentions. ITPOA contends the responsible official did not show that all relevant environmental factors were considered in making the threshold determination under SEPA, the Partnership's proposal required a full environmental impact statement (EIS) and developmental decisions were made by city staff in stages without consideration of their cumulative effects.

The Partnership contends the responsible official did not have to consider impacts which were merely possible, speculative or remote when the threshold determination was made, only those significant adverse impacts which were probable. RCW 43.21C.031; RCW 43.21C.110(1)(d); WAC 197-11-060(4)(a), (c). According to the Partnership, ITPOA had the burden of showing that the responsible officials failed to consider probable, significant adverse environmental impacts and it has not done so.

Standard of Review. Appeals under SEPA are appeals of the governmental action together with its accompanying environmental determinations. RCW 43.21C.075. The clearly erroneous standard applies to the review of substantive SEPA decisions. *Cougar Mt. Assocs. v. King Cy.*, 111 Wn.2d 742, 747, 765 P.2d 264 (1988). A decision is clearly erroneous only if the court is left "with the definite and firm conviction that a mistake has been committed." *Cougar Mt.*, at 747 (quoting *Polygon Corp. v. Seattle*, 90 Wn.2d 59, 69, 578 P.2d 1309 (1978)).

Threshold Determinations. Agencies must make a threshold determination before taking any major action. RCW 43.21C.030(2)(c), .031. A threshold determination is the agency's decision whether to require preparation of an EIS. WAC 197-

-11-330. A threshold determination is required for any non-exempt proposal which meets the SEPA definition of action. WAC 197-11-310.

In making a threshold determination, the responsible official must (1) review the environmental checklist and independently evaluate the responses of the applicant, (2) determine if the proposal is likely to have a "probable significant adverse environmental impact", and (3) consider mitigation measures which the applicant will implement as part of the proposal. WAC 197-11-330(1). The criteria and procedures for determining whether a proposal is likely to have a significant adverse impact are specified in WAC 197-11-330.

In determining an impact's significance, the responsible official must take into account the fact the same proposal may have a significant adverse impact in one location but not in another; that several marginal impacts when considered together may result in a significant adverse impact; and that for some proposals, it may be impossible to forecast environmental impacts with precision. WAC 197-11-330(3). A threshold determination must not balance whether the beneficial aspects of a proposal outweigh its adverse impacts. WAC 197-11-330(5).

If the responsible official determines there will be no probable significant adverse environmental impacts, the lead agency issues a DNS. WAC 197-11-340(1). SEPA also permits an MDNS, which allows an agency to consider mitigation measures that the applicant will implement. WAC 197-11--350. It is a determination that, as mitigated, the proposal will not have a significant adverse environmental impact. An agency's decision to issue an MDNS and not require an EIS is accorded substantial weight. RCW 43.21C.090.

Phased Review. Phased review is defined as "the coverage of general matters in broader environmental documents, with subsequent narrower documents concentrating solely on the issues specific to the later analysis". WAC 197-11--776. SEPA allows for "phased review" because it assists agencies and the public to focus on issues ready for decision and to exclude from consideration issues already decided or not yet ready. WAC 197-11-060(5)(b).

Cumulative Effects. We note at the onset that the responsible official's initial evaluation of the underground fuel storage tanks separate from other phases of the proposal was in error. Parts of proposals which are "related to each other closely enough to be, in effect, a single course of action shall be evaluated in the same environmental document". WAC 197-11-060(3)(b). Here, a phased review of the project was clearly inappropriate because it would serve only to avoid discussion of cumulative impacts. WAC 197-11-060(5)-(d)(ii). *See also* WAC 197-11-060(3)(b). However, the error was cured when the original MDNS and DNS were withdrawn, and the cumulative effects of the entire project considered before a new MDNS was issued.

Redevelopment of the shopping district also included plans for a car wash. In B1 zones, a car wash requires a special permit. When addressing neighborhood concerns about the noise impacts from the car wash, the hearing examiner responded "there is no car wash in this application and a special permit must be applied for before a car wash can be built in conjunction with this use". To the extent the hearing examiner was approving separate SEPA review for the car wash, he was in error. WAC 197-11-060(3)(b). However, the error was harmless because the responsible official considered the impact of the car wash when making the threshold determination and required mitigation measures for it.

Agency Action Not Clearly Erroneous. The administrative record reflects the agency's review of the environmental checklist and independent evaluation of the Partnership's responses as required by WAC 197-11-310. Relevant environmental factors were considered in making the threshold determination. *Lassila v. Wenatchee*, 89 Wn.2d 804, 576 P.2d 54 (1978); WAC 197-11-350. The environmental checklist, DNS and MDNS were circulated to other agencies for comments, including the Department of Ecology, and to the public.

The record also reflects the responsible officials' consideration of the many comments received after issuance of its first DNS and MDNS. An additional traffic study was obtained, comments from the City Traffic Engineer and Spo-

kane Regional Council were received and considered, adverse impacts brought to the officials' attention by neighborhood residents were evaluated and additional mitigation measures were required. The hearing examiner found that, with two exceptions, the responsible official identified those aspects of the proposal which could result in significant adverse impacts on the surrounding environment and set forth adequate mitigation measures in the MDNS. The two exceptions were venting of the fuel storage tanks and delivery truck noise. As to the venting of the tanks, the hearing examiner remanded for additional information and for a determination whether mitigation measures were necessary. As to noise from delivery trucks, a remand required the responsible official to show how the specified performance standard was to be attained. The inadequacies of the first DNS and MDNS were corrected. The criteria and procedures required under SEPA were met. *See, e.g.*, WAC 197-11-330.

ITPOA contends the agency failed to take into account the adverse impacts on the physical environment due to economic competition. We agree that if the probable effect of competition is such that the "built environment" is affected, review is called for by WAC 197-11-444(2). *West 514, Inc. v. County of Spokane*, 53 Wn. App. 838, 845, 770 P.2d 1065, *review denied*, 113 Wn.2d 1005 (1989). However, economic competition, in and of itself, is not an element of the environment under WAC 197-11-448(3). SEPA review was not inadequate on this basis.

Based on our review of the entire administrative record, we cannot say that the agency's decision to issue an MDNS for the Partnership project was clearly erroneous. The judgment of the Superior Court is affirmed.

MUNSON and SWEENEY, JJ., concur.