[No. 30381-1-III.    Division Three.    October 30, 2012.]

ELLENSBURG CEMENT PRODUCTS, INC., *Appellant*, v. KITTITAS COUNTY ET AL., *Respondents*.

692

*Michael J. Murphy* and *William J. Crittenden* (of *Groff Murphy PLLC*), for appellant.

*Gregory L. Zempel, Prosecuting Attorney*, and *Neil A. Caulkins, Deputy*, for respondent Kittitas County.

*James C. Carmody* (of *Velikanje Halverson PC*), for respondent Homer L. (Louie) Gibson.

¶1 KULIK, J. — Homer L. "Louie" Gibson owns real property in Kittitas County (County) that is designated "rural" under the Kittitas County Comprehensive Plan and zoned "agriculture-20" (A-20). Through a series of administrative proceedings, and an appeal to superior court, Mr. Gibson obtained a determination of nonsignificance (DNS) and a conditional use permit (CUP) allowing him to crush rock on his property. On appeal here, Ellensburg Cement Products Inc. (ECP) asserts the CUP must be reversed because rock crushing is not a permitted or a conditional use in the A-20 zone. ECP also contends the DNS must be reversed because (1) the County violated State Environmental Policy Act (SEPA), chapter 43.21C RCW, regulations regarding the use of existing environmental documents and (2) the record shows no meaningful SEPA review.

¶2 We conclude that the unambiguous language of the Kittitas County Code (KCC)[1] does not permit rock crushing in A-20 zones, and that the County's failure to provide one open record hearing on the SEPA appeal was erroneous as a matter of law. Therefore, we reverse the issuance of the CUP and the SEPA determination of nonsignificance.

## FACTS

¶3 Mr. Gibson owns 84 acres of real property situated on five contiguous parcels in rural Kittitas County. The property is designated "rural" under the Kittitas County Comprehensive Plan and zoned A-20. Clerk's Papers (CP) at 102, 192.

---

[1] KCC 17.29.020(A)(13).

¶4 *Miller CUP.* In December 1997, Mr. Gibson's predecessor, John Miller, obtained a CUP for gravel extraction on one of the five parcels now owned by Mr. Gibson. This parcel is 13.4 acres in size. At some point, Mr. Gibson began expanding the gravel extraction area into the other parcels. In August 2008, the Department of Natural Resources (DNR) issued a stop work order. In April 2009, the court issued a notice of violation for unauthorized excavation *and/or* rock crushing on the five Gibson parcels. The County apparently did not follow up on this violation.

¶5 *Gibson DNR Permit.* In October 2008, Mr. Gibson applied for a DNR surface mining permit. The SEPA checklist submitted by Mr. Gibson indicated that he sought to mine an area of approximately 60 acres. At that point, Mr. Gibson had a CUP for only 13.4 acres. DNR issued Mr. Gibson a surface mining permit for a 60 acre site.

¶6 The project entailed:

> Mining, crushing and removal of approximately 3,000,000 cubic yards of basalt/basalt shale from an area of approximately 60 acres. At present rock crushing is not occurring on the site, but might possibly occur in the future. Upon completion of mining the site will be used as a shop and equipment storage area, and house sites, therefore replacement of topsoil on either the pit floor or slopes is not anticipated or desirable.

CP at 158.

¶7 DNR reviewed the application and issued a SEPA threshold determination on November 10, 2008, concluding:

> The lead agency for this proposal has determined that it does not have a probable significant adverse impact on the environment. An environmental impact statement (EIS) is not required under RCW 43.21C.030(2)(c). This decision was made after review of a completed environmental checklist and other information on file with the lead agency. This information is available to the public on request.

CP at 164.

¶8 No appeal was filed. DNR issued a surface mining reclamation permit (DNR permit) on December 3, 2008. The

DNR permit stated that (1) the total disturbed area would be 60 acres, (2) the maximum depth below premining topographical grade would be 130 feet, and (3) the maximum depth of excavated mine floor would be 1,890 feet relative to sea level.

¶9 *CUP Application.* In June 2010, Mr. Gibson submitted the CUP application at issue here. He requested a CUP for the placement of rock crushing, screening, and washing operations, and temporary concrete and asphalt plants in the A-20 zone.

¶10 Mr. Gibson argues that the application for the CUP proposed to amend the existing Miller CUP. This amendment was to allow for the expansion of the existing CUP onto the adjoining parcels. In contrast, ECP argues that Mr. Gibson's CUP application did not seek to expand the existing CUP. According to ECP, the CUP application misleadingly implied that the existing CUP already applied to all five parcels. Moreover, in ECP's view, Mr. Gibson's CUP application sought to amend the existing CUP to allow new uses, including rock crushing, screening, and washing, as well as temporary plants for asphalt and concrete recycling.

¶11 ECP points out what purports to be a copy of the 2008 SEPA checklist that Mr. Gibson submitted to DNR. According to ECP, pages 1 and 3 through 6 of the checklist were the same as the 2008 checklist. However, other pages had been altered in the following ways: (a) on page 2, paragraph 11 of the original 2008 checklist referred to mining on a 60 acre site but paragraph 11 of page 2 of the altered checklist referred to mining on an 84 acre site and (b) the bottom of page 7 had been altered to remove the original 2008 date.

¶12 In June 2010, the County issued a determination that Mr. Gibson's application was complete. One month later, the County published a notice of application for the CUP. The notice indicated that the County expected to issue a DNS for the CUP application.

¶13 In August, ECP filed its objection to the CUP application. ECP pointed out that rock crushing and asphalt plants were not permitted or conditional uses in the A-20 zone. ECP also explained that (a) Mr. Gibson's gravel extraction had been illegally expanded; (b) the application did not ask to expand the existing CUP to the other parcels; (c) the 2008 SEPA checklist did not address the impacts of the current application; and (d) no studies of the impacts of the CUP on dust, water, noise, vibration, safety, storm water, and toxics prevention had been performed. ECP asserted that the County, as SEPA lead agency, could not simply reuse the 2008 checklist from DNR. In short, ECP took the position that no meaningful SEPA review had occurred and that the County had abdicated its responsibilities under SEPA.

¶14 In September, Mr. Gibson amended his application to delete washing operations and the temporary concrete and asphalt plants. One month later, the County issued a DNS to expand the existing gravel pit and to allow rock crushing. There is no evidence that any additional studies were performed before the DNS was issued. Later, the ECP appealed the DNS to the board of county commissioners and the CUP to the board of adjustment (BOA).

¶15 *Notice of SEPA Appeal.* In March 2011, the County issued a notice that the BOA would hold a closed record hearing on the SEPA appeal and the CUP. The County filed its SEPA appeal brief, which expressly recognized that rock crushing was *not* considered a conditional or permitted use in the A-20 zone. Specifically, the brief read:

> Indeed, there appears a problem with this application comporting with the underlying zoning in that it is asking for permission to engage in rock crushing, which is not a listed conditional use in this zone. But only the BOA has jurisdiction to answer that question when it reviews the merits of the application.

CP at 206.

¶16 The County provided for a single integrated comment period under the optional DNS process established by WAC 197-11-355. The process required the lead agency to advise recipients of the likely determination of the proposal. The County's notice contained the following disclosure:

> *The County expects to issue a Determination of Non-Significance (DNS)* for this proposal, and will use the optional DNS process, meaning *this may be the only opportunity for the public to comment on the environmental impacts of the proposal.* Mitigation measures may be required under applicable codes, such as Title 17 Zoning, Title 17A Critical Areas, and the Fire Code, and the project review process may incorporate or require mitigation measures regardless of whether an EIS is prepared. A copy of the threshold determination may be obtained from the County.

CP at 261 (emphasis added).

¶17 Notice was circulated to agencies and neighbors. Affected agencies, including the Kittitas County Department of Public Works, the Kittitas County Fire Marshall, DNR, and the Department of Ecology, submitted comments. No commenting agencies objected to the proposal or opposed issuance of a DNS. Neighbors initially asked questions, but ultimately, the neighbors expressed support for the project.

¶18 *Closed Record SEPA Appeal Hearing.* In April, ECP wrote the County's attorney to object to the BOA's stated intent to hold only a closed record hearing. ECP acknowledged that the County had recently amended its code to eliminate the established procedures for an open record hearing. ECP argued that the closed record SEPA appeal was unlawful under RCW 36.70B.020 and the relevant county codes. ECP also asked the County to explain the discrepancies and apparent alterations in the 2008 SEPA checklist. The County's attorney responded by directing ECP to chapter 15A.07 of the KCC.

¶19 The County also issued a memorandum to the BOA regarding the County's new SEPA procedures. The County's

attorney explained that KCC 15A.07.010 and .020 required a closed record process with only written briefs from the parties. Specifically, the County's attorney stated that

> [t]he process was designed by the Board of County Commissioners to provide for no oral argument, no presentation of witnesses, testimony, or cross-examination, and no presentation of evidence additional to the existing record. The matter is to be dealt with completely in writing. The record is essentially closed, the argument has been made in the form of the briefs before you, and your task is to make your decision based upon that record and briefing. If you have procedural questions, you may ask staff, but may not ask staff substantive questions about the matter. Nor may the BOA address or be addressed by the applicant or appellant during this deliberation.

CP at 108.

¶20 At the closed record SEPA hearing, the County received no evidence to establish that noise was a significant environmental impact. And no evidence was provided showing that the proposal presented adverse impacts as to roads or transportation, air quality, or surface water or groundwater. The critical area site analysis was completed by county staff pursuant to Title 17A KCC. There were no critical areas on site. No adverse impacts on farmland or agricultural operations were identified or documented.

¶21 The County determined that the proposal would not have a probable significant adverse impact on the environment and issued a DNS on October 21, 2010. A notice of SEPA action and the public hearing on the CUP application was properly published.

¶22 *Board of Adjustment SEPA Review.* ECP appealed the threshold DNS that was entered in November 2008. ECP set forth a list of objections to be reviewed.

¶23 Under the KCC, an administrative appeal of a DNS is considered by the BOA. *See* KCC 15A.04.020(4); KCC 15A-.05.010, .020. This appellate review process is based on the record before the administrative department. KCC 15A.07-

.010(2) provides that the appeal "shall not contain or attempt to introduce new evidence, testimony, or declaration." Each party is limited to a written argument and brief to the BOA. KCC 15A.07.010(2), (3). The matter is to be resolved completely by writing. KCC 15A.07.010(2).

¶24 On May 11, the BOA held a closed record hearing on the SEPA appeal. ECP's counsel objected, arguing that an open hearing was required. ECP's counsel attempted to submit a binder of exhibits as well as a supplemental memorandum relating to the SEPA issues. The BOA would not allow ECP's counsel to address the BOA, and the BOA chair directed BOA members not to consider any new information.

¶25 The BOA unanimously denied the appeal of the DNS designation.

¶26 *Board of Adjustment CUP Review.* Following the determination regarding the SEPA review, the BOA then proceeded with an open record hearing on the CUP. Interested parties provided testimony, evidence, and argument at the hearing. ECP was the only objecting party. ECP took the position that rock crushing was not a permitted or conditional use in the A-20 zone.

¶27 Following the public testimony, the BOA closed the public hearing and deliberated on the CUP application. The BOA approved the CUP and adopted findings of fact and conclusions of law. By a vote of two in favor, one opposed and one abstention, the BOA concluded that rock crushing was permitted in the A-20 zone as "[p]rocessing of products produced on the premises" under KCC 17.29.020(A)(13).

¶28 *Superior Court.* ECP sought review in superior court under the Land Use Petition Act (LUPA), chapter 36.70C RCW. After briefing by the parties and a hearing on the merits, the superior court upheld the BOA's decision. The court also granted Mr. Gibson's motion to strike two declarations filed by ECP. The first declaration authenticated two documents ECP submitted to the BOA during the closed record hearing on the SEPA appeal. The second declaration au-

thenticated two documents rebutting assertions in Mr. Gibson's LUPA brief indicating that the property had a long history of rock crushing. ECP appeals.

## ANALYSIS

¶29 LUPA provides the exclusive means for review of land use decisions in the state of Washington. RCW 36.70C-.030(1). When reviewing a superior court's decision under LUPA, the court stands in the shoes of the superior court and reviews the ruling below on the administrative record. *Isla Verde Int'l Holdings, Inc. v. City of Camas*, 146 Wn.2d 740, 751, 49 P.3d 867 (2002).

¶30 ECP challenges (1) Kittitas County's interpretation of its local ordinance, (2) the adopted administrative appeal procedures, and (3) the SEPA environmental review and threshold determination. This appeal is governed by the following standards:

> (a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;

> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

> . . . .

> (d) The land use decision is a clearly erroneous application of the law to the facts.

RCW 36.70C.130(1).

¶31 The petitioner bears the burden to prove a violation of one of the applicable standards. *Pinecrest Homeowners Ass'n v. Cloninger & Assocs.*, 151 Wn.2d 279, 288, 87 P.3d 1176 (2004). Judicial review of a land use decision under LUPA is based on the administrative record before the BOA. *See* RCW 36.70C.120(1).

¶32 Here, the record was certified and provided to the superior court. Supplementing the record is limited. RCW 36.70C.120(2) provides:

For decisions described in subsection (1) of this section, the record may be supplemented by additional evidence only if the additional evidence relates to:

(a) Grounds for disqualification of a member of the body or of the officer that made the land use decision, when such grounds were unknown by the petitioner at the time the record was created;

(b) Matters that were improperly excluded from the record after being offered by a party to the quasi-judicial proceeding; or

(c) Matters that were outside the jurisdiction of the body or officer that made the land use decision.

¶33 ECP submitted declarations to the superior court. The trial court rejected these declarations relating to the history of rock crushing on the Gibson's property. We need not address this issue because of our decision here. We also ignore the unsupported historical assertions Mr. Gibson makes in his brief.

¶34 Mr. Gibson points out that ECP has failed to challenge any findings of fact. Unchallenged findings of fact are verities on appeal. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 808, 828 P.2d 549 (1992). However, the issues here are questions of law, which we review de novo. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003).

### A. Is rock crushing a permitted use in the A-20 zone?

¶35 The BOA issued Mr. Gibson a CUP to perform rock crushing in the A-20 zone. The A-20 zone is one of four agricultural land use classifications[2] in the County. The BOA concluded that rock crushing was permitted under KCC 17.29.020(A)(13) as a "[p]rocessing of products produced on the premises." In contrast, gravel extraction, a conditional use, requires a CUP.

___

[2] KCC 17.28.020(14) (A-3); KCC 17.28A.020(15) (A-5); KCC 17.29.020(A)(13) (A-20); KCC 17.31.020(9) (CA).

¶36 We interpret local ordinances in the same way we interpret statutes. *Kitsap County v. Mattress Outlet*, 153 Wn.2d 506, 509, 104 P.3d 1280 (2005). Courts look for the meaning of a statute in its wording, the context in which the statute is found, and the entire statutory scheme. *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005). The plain meaning of an unambiguous ordinance controls. *State v. Villarreal*, 97 Wn. App. 636, 641-42, 984 P.2d 1064 (1999).

¶37 KCC 17.29.020(A)(13) permits "[p]rocessing of products produced on the premises" in agricultural zones. For all four agricultural zones, "gravel extraction" is designated as a conditional use while "rock crushing" is not listed. Rock crushing and other activities associated with mining are permitted uses in rural mining districts and in the forest and range, liberty historic, and commercial forest zones. "Rock crushing" is expressly listed as either a permitted or a conditional use in zones other than agricultural zones.

¶38 ECP argues that in light of the *unambiguous* exclusion of "rock crushing" from the permitted and conditional uses in the agricultural zones, the BOA's interpretation is clearly erroneous. Mr. Gibson and the County argue that the BOA's decision was correct given the wording "processing of products produced on the premises." They also maintain that the wording is *unambiguous* and that the County's interpretation of the language is entitled to deference under RCW 36.70C.130(1)(b).

¶39 The definitions of the words "process," "produced," and "product" are helpful. To "process" an item is "to prepare for market, manufacture, or other commercial use by subjecting to some process." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1808 (1993). An item is "produce[d]" when it is caused "to have existence or to happen : br[ought] about : ORIGINATE[D] . . . give[n] being, form, or shape to : ma[d]e often from raw materials." WEBSTER'S, *supra*, at 1810. Arguably, both of these definitions could be applied to include rock crushing. But the definition of "product" is dispositive.

"Product" has one agricultural definition. Specifically, a "product" is "something produced naturally or as the result of a natural process (as by generation or growth) <major ~s from forest lands . . . are mahogany or chicle —*American Annual*>." Webster's, *supra*, at 1810 (alteration in original).

¶40 This definition of "product" encompasses agricultural items, but not rock crushing. When we examine a term in a statute, we look for its meaning in the wording of the statute, the context in which the statute is found, and the entire statutory scheme. The "processing of products produced on the premises" describes the activities permitted only in agricultural zones. Significantly, in *rural* zones outside of mining districts, rock crushing is listed only as a conditional use.

¶41 Other provisions also support the exclusion of rock crushing in agricultural zones. The purpose of agricultural zones is to allow agricultural activities to exist with low density development and "to preserve fertile farmland from encroachment by nonagricultural land uses." KCC 17.29-.010. The definition of "agricultural activity" includes "processing" as an activity:

> "Agricultural activity" includes, but is not limited to, the growing or raising, harvesting, storage, disposal, transporting, conditioning, *processing*, sale, and research and development of, but not limited to, the following: horticultural crops, poultry, livestock, grain, mint, hay, forages and feed crops, apiaries, beekeeping, equine activities, leather, fur, wool, dairy products and seed crops.

KCC 17.74.020(3) (emphasis added).

¶42 " 'Under expressio unius est exclusio alterius, a canon of statutory construction, to express one thing in a statute implies the exclusion of the other.' " *State v. Delgado*, 148 Wn.2d 723, 729, 63 P.3d 792 (2003) (quoting *In re Det. of Williams*, 147 Wn.2d 476, 491, 55 P.3d 597 (2002)). Here, the agricultural use classification encompasses products produced by agricultural means. Because rock crush-

ing is not an agricultural means, and only gravel excavation is listed as a conditional use, the logical conclusion is that rock crushing is not allowed in an A-20 zone because it is not listed as a permitted or conditional use.

¶43 As we noted above, courts look for the meaning of a statute in its wording, the context in which it is found, and the entire statutory scheme. *State v. Stratton*, 130 Wn. App. 760, 764, 124 P.3d 660 (2005). Here, the "processing of products produced on the premises" language is used to describe an agricultural zone that expressly states that gravel extraction is a conditional use and that does not refer to "rock crushing." Indeed, the language regarding gravel extraction would not be necessary if "processing of products" was read to be all inclusive.

¶44 To accept the argument that "processing of products produced on the premises" is broad enough to encompass rock crushing requires this court to ignore the definition of "product" applicable to agricultural zones, the context in which the word is used, and the entire statutory scheme.

¶45 Relying on *Valentine v. Board of Adjustment*, 51 Wn. App. 366, 753 P.2d 988 (1988), the County asserts that crushing is a part of "processing" as a matter of law. *Valentine* indirectly confirms that "gravel extraction" and "rock crushing" are not the same. *Id.* at 373-74. Significantly, *Valentine* did not consider the phrase "processing of products produced on the premises" or the context of the word "produced," or the fact that rock crushing was a conditional use in rural zones.

¶46 Because the phrase "processing of products produced on the premises" is not ambiguous, we need not consider the issue of deference to the County or the impact of construing the ordinance in the light most favorable to the property owner.

¶47 In summary, the phrase "processing of products produced on the premises" is unambiguous and should be applied by its plain meaning. Rock crushing is not a permitted or a conditional use in an A-20 zone.

## B. Should the County's issuance of the DNS be reversed?

¶48 ECP contends that the County's issuance of a DNS was clearly erroneous for two reasons: (1) the County violated SEPA regulations regarding the use of existing environmental documents, and (2) the record shows no meaningful SEPA review of the project.

¶49 A SEPA threshold determination is reviewed under the "clearly erroneous" standard. *Chuckanut Conservancy v. Dep't of Natural Res.*, 156 Wn. App. 274, 286, 232 P.3d 1154 (2010). A court will overturn a DNS only when " 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Norway Hill Pres. & Prot. Ass'n v. King County Council*, 87 Wn.2d 267, 274, 552 P.2d 674 (1976) (quoting *Ancheta v. Daly*, 77 Wn.2d 255, 259, 461 P.2d 531 (1969)). The agency's threshold decision shall be given substantial weight. RCW 43.21C.090.

¶50 1. *Use of Existing Environmental Documents.* The SEPA checklist submitted by Mr. Gibson as part of the CUP application was merely a copy of the 2008 DNR environmental checklist that had been altered to revise the description of Mr. Gibson's proposal. The altered checklist increased the size of the proposal to 84 acres and added rock crushing, screening, and washing, as well as temporary plants for concrete, asphalt, and concrete recycling.

¶51 ECP told the County that SEPA has specific rules governing the use of existing environmental documents and that the County could not simply reuse the 2008 checklist. In response, the County argued that the SEPA environmental checklist was optional and that the County had properly reused the 2008 checklist. Ultimately, the BOA upheld the DNS.

¶52 ECP maintains that the County erroneously argued that a SEPA checklist is optional. But there was no failure to submit an environmental checklist. Mr. Gibson provided

two checklists for the project, one for the surface mining before DNR and one for the CUP. The checklists were for the same projects. Both checklists are in the administrative record, and presumably, both were reviewed prior to the issuance of the threshold decision. Significantly, ECP pointed out the differences.

¶53 SEPA encourages the combining of environmental documents in order to reduce duplication and paperwork. WAC 197-11-640 provides:

> The SEPA process shall be combined with the existing planning, review, and project approval processes being used by each agency with jurisdiction. When environmental documents are required, they shall accompany a proposal through the existing agency review processes. Any environmental document in compliance with SEPA may be combined with any other agency documents to reduce duplication and paperwork and improve decision making.

¶54 The regulations recognize that agencies "may use an environmental checklist whenever it would assist in their planning and decision making." WAC 197-11-315(3). The lead agency makes its threshold decision based upon information reasonably sufficient to evaluate the environmental impact of the proposal. WAC 197-11-355.

¶55 Here, both checklists were identical in the identification of five parcels of property totaling 84 acres, and the sequential mining plans. However, DNR focused on the excavation of 60 acres while the CUP covered the entire 84. Also, Mr. Gibson had removed washing operations and temporary concrete and asphalt plants from the DNR application. A reduction in scale of the application does not require reprocessing of the environmental review. *SEAPC v. Cammack II Orchards*, 49 Wn. App. 609, 613, 744 P.2d 1101 (1987) (reduction in scope of subdivision did not require a new threshold determination).

¶56 ECP next argues that the County failed to comply with SEPA regulations regarding the use of existing

environmental documents. Under those rules, an agency must use one, or more, of four methods: (1) adoption, (2) incorporation by reference, (3) preparation of an addendum, or (4) preparation of a supplemental environmental impact statement (SEIS). WAC 197-11-600(4). ECP argues that the County failed to comply with any of these methods.

¶57 WAC 197-11-600 provides:

(4) Existing documents may be used for a proposal by employing one or more of the following methods:

(a) "Adoption," where an agency may use all or part of an existing environmental document to meet its responsibilities under SEPA. *Agencies acting on the same proposal for which an environmental document was prepared are not required to adopt the document*; or

(b) "Incorporation by reference," *where an agency preparing an environmental document includes all or part of an existing document by reference.*

(c) An addendum, that adds analyses or information about a proposal but does not substantially change the analysis of significant impacts and alternatives in the existing environmental document.

(d) Preparation of a SEIS if there are:

(i) Substantial changes so that the proposal is likely to have significant adverse environmental impacts; or

(ii) New information indicating a proposal's probable significant adverse environmental impacts.

(Emphasis added.)

¶58 An agency is not required to adopt existing environmental documents and may, instead, choose to simply incorporate the document by reference. *Moss v. City of Bellingham*, 109 Wn. App. 6, 28, 31 P.3d 703 (2001). Moreover, a harmless procedural error may not serve as a basis for the reversal of a land use decision. RCW 36.70C-.130(1)(a). Further, the failure to formally incorporate a prior environmental document is harmless error. *Concerned Taxpayers Opposed to Modified Mid-South Sequim Bypass*

v. *Dep't of Transp.*, 90 Wn. App. 225, 233, 951 P.2d 812 (1998).

¶59 2. *Meaningful SEPA Review.* The administrative review of a DNS is considered by the BOA. *See* KCC 15A.07.010(1). When ECP appealed the DNS, the County notified the parties that the BOA would hold a closed record hearing on the DNS. ECP objected then, as now, arguing that a local agency cannot hold a closed record hearing without first providing an open record hearing.

¶60 Mr. Gibson and the County maintain that a open record hearing was not required because the proceeding complied with the County's procedures for administrative review of environmental threshold determinations. Under the KCC, the appeal is based on the administrative record with all parties afforded an opportunity to present a written appellate argument. KCC 15A.07.010. The BOA considers the appeal under KCC 15A.07.020(1), which provides:

> Administrative appeals shall serve to provide argument and guidance for the body's decision. *No new evidence or testimony shall be given or received.* The briefing shall not contain new evidence, testimony, or declarations, but shall consist only of legal arguments based upon the documents comprising the record as transmitted to the parties by the relevant officer. The parties to the appeal shall submit timely written statements or arguments to the decision-making body.

(Emphasis added.)

¶61 ECP acknowledges that the County and the BOA complied with chapter 15A KCC. However, ECP contends that, under state law, the County and the BOA could not hold a closed record hearing until an open record hearing had taken place. ECP relies on RCW 36.70B.060(6), which reads, in part:

> Except for the appeal of a determination of significance as provided in RCW 43.21C.075, *if a local government elects to provide an appeal of its threshold determinations* or project permit decisions, *the local government shall provide for no more*

*than one consolidated open record hearing on such appeal*. The local government need not provide for any further appeal and may provide an appeal for some but not all project permit decisions.

(Emphasis added.)

¶62 ECP reads this provision as follows: (1) the first sentence of this provision provides that the first SEPA appeal must be an open hearing; (2) the second sentence states that no further appeal is required; and (3) the third sentence states that if a subsequent appeal is required, that appeal must be a closed record appeal.

¶63 ECP also points to the definition of "closed record appeal," which states:

"Closed record appeal" means an administrative appeal on the record to a local government body or officer, including the legislative body, *following an open record hearing on a project permit application* when the appeal is on the record with no or limited new evidence or information allowed to be submitted and only appeal argument allowed.

RCW 36.70B.020(1) (emphasis added); *see also* WAC 197-11-721.

¶64 Mr. Gibson and the County read these provisions differently. The County contends that RCW 36.70B.060(6) merely limits the number of open record hearings that can take place. In the County's view, RCW 36.70B.060(6) does not place a prohibition on other processes that do not incorporate open record hearings.

¶65 This interpretation ignores the fact that the first sentence of RCW 36.70B.060(6) states that if a local government elects to provide an appeal, "the local government shall provide for no more than one consolidated open record hearing on such appeal." While perhaps cryptic, this sentence is based on the assumption that there will be at least one open hearing. The phrase "the local government *shall provide for no more than one* consolidated open record hearing" indicates that the local government shall provide

one open hearing. This language does not provide that the local government can elect to have only a closed hearing.

¶66 The County also argues that its process was sufficient because the County did not have to permit a SEPA appeal in the first place. The County relies on WAC 197-11-680(2), which provides, in part:

> Agencies may establish procedures for such an appeal, or may eliminate such appeals altogether, by rule, ordinance or resolution. Such appeals are subject to the restrictions in RCW 36.70B.050 and 36.76B.060 that local governments provide no more than one open record hearing and one closed record appeal for permit decisions.

¶67 Because the County established procedures for an appeal, RCW 36.70B.060 and WAC 197-11-680(2) apply to these procedures. The fact that the County could have elected not to establish appeal procedures does not mean that the County can elect whether or not to comply with the statutory requirements. Moreover, RCW 36.70B.060 states that local agencies planning under the Growth Management Act, chapter 36.70A RCW, had to establish compliant permit processes by March 31, 1996.

¶68 " '[T]he record of a negative threshold determination by a governmental agency must demonstrate that environmental factors were considered in a manner sufficient to amount to prima facie compliance with the procedural requirements of SEPA.' " *Pease Hill Cmty. Grp. v. County of Spokane*, 62 Wn. App. 800, 810, 816 P.2d 37 (1991) (internal quotation marks omitted) (quoting *Sisley v. San Juan County*, 89 Wn.2d 78, 85, 569 P.2d 712 (1977)). "The determination must be based upon information reasonably sufficient to determine the environmental impact of a proposal." *Id.*

¶69 ECP describes the practical side to this controversy. ECP asserts that a meaningful closed record appeal cannot take place unless an open record hearing has been held. Because ECP was not allowed to submit any evidence or

argument after the SEPA threshold decision was made, there was nothing for the BOA to review in deciding the appeal. The hearing record shows that BOA members were not happy with the constraints placed on their decision making and that the BOA did not ask any substantive questions before voting to deny the SEPA appeal.

¶70 The County's failure to provide an open record hearing on ECP's SEPA appeal was erroneous as a matter of law. Because of the court's resolution of this matter, the court need not address the issue as to the admissibility of the two declarations.

■■■■ ¶71 *Attorney Fees.* Mr. Gibson and the County seek attorney fees pursuant to RCW 4.84.370. This provision provides that "reasonable attorneys' fees and costs shall be awarded to the prevailing party or substantially prevailing party" for the appeal of certain decisions made by the county. RCW 4.84.370(1). Because they are not the prevailing parties, they are not entitled to an award of fees.

¶72 *Conclusion.* We reverse the issuance of the DNS and CUP, and we deny attorney fees to the County and Mr. Gibson.

KORSMO, C.J., and SWEENEY, J., concur.

Review granted at 176 Wn.2d 1027 (2013).